Anonka and Tammra **JOCHAM,** Plaintiffs,

v.

**TUSCOLA COUNTY, Tuscola County Board of Commissioners, and John Does 1–5, Defendants.**

No. 01–10385–BC.

United States District Court, E.D. Michigan, Northern Division.

Jan. 7, 2003.

David W. Wright, Bloomfield Hills, MI, Jean M. Hansen, Bloomfield Hills, MI, for Anonka Jocham, Tammra Jocham.

Daniel S. Saylor, Garan Lucow, Detroit, MI, Joseph Kochis, Grand Blanc, MI, for County of Tuscola.

Daniel S. Saylor, Detroit, MI, Joseph Kochis, Grand Blanc, MI, for Tuscola County Bd. of Com'rs.

*OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFFS' MOTION FOR RELIEF FROM CASE MANAGEMENT ORDER*

LAWSON, District Judge.

The plaintiffs in this case seek to enjoin the placement of a creche as part of a seasonal display in front of the Tuscola County, Michigan courthouse, and they complain about the treatment they received after they attempted to voice their objections to the nativity scene at a public meeting of the Tuscola County Board of Commissioners. On April 10, 2002, this Court entered a case management order following a case management and calendar conference attended by counsel for the parties in accordance with Federal Rule of Civil Procedure 26(a)-(c). Thereafter, the parties brought several discovery disputes to the Court, and on June 7, 2002 the Court entered an order adjudicating those disputes which provided, in part, that the plaintiffs could apply to the Court for relief from the case management order if information came to light suggesting that the defendants were withholding documents ordered to be pro-

duced. The matter is now before the Court on the plaintiffs' motion for relief from the case management order, the defendants' motion to dismiss, and the parties' cross-motions for summary judgment.

The Court heard oral argument from the parties in open court on October 30, 2002. Since that time, the plaintiffs have filed "Historical Exhibits," and "Objections to Defendants' 2002 Creche Activities and Invitation for Judicial View," which contain allegations about the display on the courthouse lawn during the 2002 holiday season. The motions, which had been taken under advisement, are now ready for decision. The Court finds that the plaintiffs have not shown that there are any additional documents which the defendants should have made available or evidence that documents have been concealed, and the Court will therefore deny the plaintiffs' motion for relief from the Case Management and Scheduling Order. The Court also finds that the plaintiffs have failed to state claims for relief based on their stated theories under the Free Exercise Clause, the Due Process Clause, Sections 1985 and 1986 of Title 42 of the United States Code, the Americans with Disabilities Act, and various Michigan state and international laws, and the Court will therefore grant the defendants' motion to dismiss those respective counts of the amended complaint. However, the plaintiffs have stated a cognizable claim under the Equal Protection Clause, and the defendants' motion to dismiss that count will be denied. Finally, the Court finds that there is no genuine issue of material fact with respect to the plaintiffs' Establishment Clause claim, and the defendants are entitled to a judgment on that claim as a matter of law. The

Court will therefore grant the defendants' motion for summary judgment.

## I.

This case arises from the seasonal display that appears each December on the lawn of the Tuscola County Courthouse, and which includes a nativity scene commemorating the Christmas holiday. The defendants have supplied color photographs of the scene in question, the authenticity of which has not been challenged. *See* Photographs, Defs.' S.J. Ex. C.[1] On the front lawn to the right of the courthouse, a sizable nativity scene can be observed, featuring statues of Mary and Joseph, an infant in a manger, the three wise men, two shepherds, at least two sheep, a cow, a donkey, two camels, a small angel overlooking the creche itself, and a star on a pole. To the right of the nativity scene, two toy soldiers have been erected next to a frilly gate. A sign affixed near one of the soldiers indicates that this display is owned by the Caro Downtown Development Authority, and that the materials for it were donated by the Michigan Sugar Company. The front of the courthouse itself is adorned by two wreaths and a sizable "Seasons Greetings" message. Finally, lampposts surrounding the courthouse square are festooned with pine garlands.

In a letter dated December 8, 2001, counsel for the plaintiffs informed the Tuscola County Board of Commissioners that she "represents Caro citizens who have grave concerns regarding violations of the Establishment Clause of the First Amendment of the United States and Michigan Constitutions with respect to the nativity scene erected on the front lawn of the Tuscola County Courthouse." Hansen

---

1. The plaintiffs have also furnished photographs of the display, but they are cropped so as to limit the view to the creche itself and

omit depiction of the other holiday decorations. *See* Photographs, Pls.' S.J. Ex. 1.

Letter, 12/8/2001, Defs.' S.J. Ex. A. The letter demanded that the offending display be dismantled no later than December 15, 2001. *Id.*

The parties agree that the plaintiffs, Anonka and Tammra Jocham, subsequently appeared with counsel at a Tuscola County Board of Commissioners meeting on December 11, 2001, and that during what appears to be a period set aside for citizen comments at the end of the meeting, plaintiff Anonka stood up and raised her concerns about the creche. There appears to be no dispute that Anonka's request was not well-received, and that several (but not all) Commissioners reacted angrily and indicated that they had no intention of ordering the nativity scene to be dismantled. Other attendees also apparently directed derisive comments toward the plaintiffs, who are the proprietors of "Anonka's Witch Museum," located one or two blocks from the courthouse.

On December 13, 2001, Norma Bates, the chairperson of the Tuscola County Board of Commissioners, sent counsel for the plaintiffs a letter in response to the plaintiffs' demand letter, in which she asserted that the Board had consulted its general counsel and concluded that the nativity scene, because it was privately-financed and placed in a public forum, did not offend either the United States or Michigan constitutions. Bates Letter, 12/13/2001, Defs.' S.J. Ex. B. As a result, the letter stated, the Board would not hold further meetings on the matter or direct that the nativity scene be disassembled. *Id.*

The plaintiffs then filed their complaint in this Court on December 17, 2001 against Tuscola County and the Tuscola County Board of Commissioners, as well as various "John Does" who have allegedly conspired behind the scenes to deprive the plaintiffs of their state and federal constitutional and statutory rights. The complaint, later amended on April 16, 2002, alleges that the defendants have permitted the religious use of county government facilities and property, including the placement of lifelike religious idols on the courthouse front lawn. Am. Compl. ¶¶ 12–13, 15–17. The creche allegedly is a Christian symbol reasonably associated with Christianity by any reasonable observer, the placement of which is intended to demonstrate intolerance for other religious views. *Id.* ¶¶ 18, 22. The plaintiffs further allege that the front lawn of the courthouse is not a public forum, and no written guidelines or objective standards exist for the selection of particular exhibits to display on government property. *Id.* ¶¶ 26–28.

The plaintiffs allege further that they do not subscribe to Christian beliefs, they regularly pass by the courthouse in their everyday activities, they have viewed the creche several times in the past, and will also do so in the future if current practice continues. *Id.* ¶¶ 31–34. The plaintiffs, as "atheists," are "offended, affronted, intimidated, and distressed by seeing the creche and this worship," *id.* ¶¶ 34, 36, and perceive an endorsement by the defendants of Christian religion over others. *Id.* ¶ 39. Furthermore, plaintiff Anonka allegedly is an elderly woman, "physically disabled and handicapped," with a history of heart disease. *Id.* ¶ 38.

The amended complaint references plaintiffs' counsel's December 8, 2001 letter to the county Board, and describes the plaintiffs' request at the December 11, 2001 Board meeting that county "officials take immediate action to remove these religious idols and practices from government property, and for government property not to be used to advance their religion." *Id.* ¶ 43. The plaintiffs contend that the meeting was open and set

up as a neutral, secure, and protected forum for the expression of citizen concerns, but that in response to their request, some County officials expressed their Christian views loudly and angrily while others remained silent in support. *Id.* ¶¶ 44, 46–47. Among other things, the plaintiffs were allegedly told "if you don't like it, don't look at it." *Id.* ¶ 66B. Plaintiff Anonka contends she was denigrated and humiliated in front of her daughter, neighbors, the press, and other attendees. *Id.* ¶ 49. Allegedly, neither plaintiff was granted the five minutes of public address to which they were entitled, *id.* ¶ 55, and their concerns were not rescheduled for a later hearing or brought up again at any time. *Id.* ¶ 58. According to the plaintiffs, a few days later, the Commissioners permitted a religious service to commence at the courthouse facilities, which condemned the plaintiffs. *Id.* ¶ 52. The service turned into a rally against the plaintiffs, and some of the participants spit on a reporter who had reported the events of the December 11, 2001 meeting. *Id.* ¶ 53. The plaintiffs allege that the community has turned against them and subjected them to widespread ridicule, including a boycott of plaintiff Anonka's witch museum. *Id.* ¶ 54, 60.

The amended complaint concludes by summarily asserting the following claims: (count 1) the First Amendment—Freedom of Religion Clause (both United States and Michigan Constitutions), *id.* at 76–80; (count 2) the First Amendment—Establishment Clause, *id.* ¶¶ 81–85; (count 3) the Fourteenth Amendment—Due Process Clause, *id.* ¶¶ 86–90; (count 4) the Fourteenth Amendment—Equal Protection Clause, *id.* ¶¶ 91–95; (count 5) Other Illegal Acts, Pattern & Practice Under Color of State Law, including violations of the constitutional oath of office, Mich. Comp. Laws § 15.151, violations and breaches of bond requirements, laws governing boards of commissioners, Mich. Comp. Laws § 46.1 *et seq.,* Michigan's Open Meetings Act, Mich. Comp. Laws § 15.261 *et seq.,* the Standards of Conduct for Public Officers and Employees, Mich. Comp. Laws § 15.341 *et seq.,* Conflict of Interest, Mich. Comp. Laws § 15.301 *et seq.,* the *International Covenant on Civil and Political Rights,* U.N.T.S. No. 14668, vol. 999, at 171 *et seq.* (1976), and various "[a]dditional laws of the U.S., Michigan, and Tuscola County," *id.* ¶ 98A–I; (count 6) Conspiracy to Interfere with Civil Rights, 42 U.S.C. § 1985, *id.* ¶¶ 101–04; (count 7) Neglect to Prevent Conspiracy, 42 U.S.C. § 1986, *id.* ¶¶ 105–08; and (count 8) the Americans with Disabilities Act and Section 1983, *id.* ¶¶ 109–13. The amended complaint seeks all permissible damages, declaratory and injunctive relief, the dismantlement of the creche and similar religious idols, statutory attorney fees, and any other relief the Court deems appropriate.

The uncontested affidavits and discovery materials filed in support of the summary judgment motions show that the nativity display belongs to the Caro Women's Interfaith Committee for Christmas (CWICC), which sponsors the display "[f]or the purpose of providing at Christmas, a community display that will be a Christ remembrance." CWICC Const. ¶ 1, Defs.' S.J. Ex. D at 1. The display is funded by donations from the women's organizations of various community churches. *Id.* ¶ 4. The group's constitution also provides that "[t]he committee shall retain title to the display" and "shall be responsible for assembling, dismantling, storage and upkeep of the display." *Id.* ¶ 5. Also attached to Exhibit D of the defendants' motion are a series of invoices from Bronner's Christmas Wonderland in Frankenmuth, Michigan, and various transportation companies, which appear to

be for the purchase and transport of the items making up the nativity scene in question. The items are listed as having been sold to the "Caro United Methodist Church" and are designated to be shipped to that same location. Also included are copies of checks issued for payment for these items, with the funds drawn on the account of the Caro Women's Inter–Faith Committee.

In a letter dated October 18, 2001, the CWICC requested the use of the courthouse lawn from November 25, 2001 through January 6, 2002. That request was approved at a Board meeting held on October 23, 2001. 10/23/2001 Full Board Minutes, Defs.' S.J. Ex. E. A similar request was approved at the October 24, 2000 Board meeting for December 2000, but the minutes do not state how the request was made to the Board. 10/24/2000 Board Minutes, Defs.' S.J. Ex. E. In 1996, the Board approved the CWICC's request to use the courthouse lawn in December and also to use, for an undisclosed purpose, the courthouse lobby on Friday, December 6, 1996 at 6 p.m. 11/26/1996 Board Minutes, Defs.' S.J. Ex. E. A request by the Downtown Development Authority (DDA) to place toy soldiers on the lawn was also approved. *Id.* Although minutes have not been supplied from other years, the parties agree that the seasonal display has been ongoing in December for several years.

The defendants have also submitted evidence indicating that the courthouse lawn has been used by a variety of organizations for many different purposes. For example, the Board approved the use of the courthouse lawn for a candlelight vigil on October 8, 2001. 9/25/2001 Full Board Minutes, Defs.' S.J. Ex. F. Earlier that year, a request was approved from the National Day of Prayer Task Force to use the courthouse lawn on May 3, 2001 and to install a banner on the lawn three days before that. 3/27/2001 Building and Grounds Minutes, Defs.' S.J. Ex. F. A Tuscola County right-to-life group was permitted to hold their annual candlelight vigil on Monday, January 22, 2001. 12/27/2000 Board Minutes, Defs.' S.J. Ex. F. A request to hold the Pumpkin Festival on the courthouse lawn on October 7 through the 10th, 1999, was also granted. 9/14/1999 Board Meeting Minutes, Defs.' S.J. Ex. F. The National Night Out Against Crime was permitted to use the lawn for a rally on August 3, 1999. 7/27/1999 Board Meeting Minutes, Defs.' S.J. Ex. F. A request to hold a candlelight vigil in memory of Cheyenne Irvine on September 12, 1998 was granted. 9/8/2002 Draft Board Minutes, Defs.' S.J. Ex. F. The Board approved a request to use the lawn for a wedding on November 25, 1997. 11/25/1997 Board Minutes, Defs.' S.J. Ex. F. The Tuscola County Domestic Violence Prevention Work Group was permitted to hold a candlelight vigil on the courthouse steps and lawn on October 23, 1997. 9/23/1997 Board Minutes, Defs.' S.J. Ex. F. A political candidate used the lawn to announce his candidacy. White–Cormier Dep. at 71–72, Defs.' S.J. Ex. H. Margie White–Cormier, the Tuscola County Clerk, also testified that she recalled veterans groups using the lawn to raise issues relating to prisoners of war. *Id.* at 72.

No guidelines or procedures exist for determining whether some requests will be granted while others will be denied. *Id.* at 72. However, White–Cormier testified that to her knowledge, not a single request for use of the courthouse lawn by an outside organization has ever been denied. *Id.* at 76, Defs.' S.J. Ex. H. Plaintiff Anonka likewise knows of no request to use the courthouse lawn that has been denied. Anonka Dep. at 56, Defs. S.J. Ex. I. Tammra Jocham testified that she was aware of a refusal, but then agreed that she could

name no individuals who had been denied use of the property. Tammra Jocham Dep. at 20–21, Defs.' S.J. Ex. J.

Most notably, the defendants note that a request from the Ku Klux Klan to use the courthouse lawn, including electrical supply, was also permitted. The Klan's notice was dated September 9, 1997. Serving Notice, Defs.' S.J. Ex. G. The Tuscola County General Counsel acknowledged the request in a letter dated September 26, 1997, but emphasized that the Klan rally would occur at the risk of those participating, and that better security could be provided near the back of the property closer to the sheriff's department. 9/26/1997 letter, Defs.' S.J. Ex. G. The plaintiffs insist that the rally was in fact held down the street and away from the courthouse, and that the request to use the courthouse steps was actually denied, although they offer no factual support for this assertion.

## II.

The defendants concede that count 2 of the complaint, based on a violation of the Establishment Clause, is valid on its face, but they have moved to dismiss counts 1 and 3 through 8 pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. To survive a motion to dismiss, a plaintiff must allege facts that if proved would result in the requested relief. *Helfrich v. PNC Bank, Kentucky, Inc.*, 267 F.3d 477, 480 (6th Cir.2001). The complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988). Where the plaintiff offers multiple factual scenarios for a particular claim, only one need be sufficient. *Briggs v. Ohio Elections Comm'n*, 61 F.3d 487, 494 (6th Cir.1995).

When considering a motion under Rule 12(b)(6), the district court must construe the plaintiff's well-pleaded allegations in the light most favorable to the plaintiff and accept the allegations as true. *Ruffin–Steinback v. dePasse*, 267 F.3d 457, 461 (6th Cir.2001). However, the district court "need not accept as true legal conclusions or unwarranted factual inferences" which are not supported by the facts pleaded. *United Food & Commercial Workers Int'l Union Local 911 v. United Food & Commercial Workers Int'l Union*, 301 F.3d 468, 472 (6th Cir.2002) (quoting *Mich. Paytel Joint Venture, v. City of Detroit*, 287 F.3d 527, 533 (6th Cir.2002)). More is ordinarily required to satisfy the federal notice pleading requirements. *Scheid*, 859 F.2d at 436–37 (citing 5 C. Wright & A. Miller, Federal Practice & Procedure § 1357, at 596 (1969)). Although it is generally improper to consider matters outside of the pleadings on a motion to dismiss, that rule does not apply to documents referenced by the pleadings themselves that are central to the plaintiff's claim. *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir.1999). This Court has confined its consideration of the motion to dismiss to the amended complaint and attached exhibits.

### A.

In count 1 of the amended complaint, the plaintiffs make reference to 42 U.S.C. § 1983, and allege that their rights under the Free Exercise Clause of the First Amendment were abridged by the defendants' actions. The defendants contend that this entire matter is in essence an Establishment Clause case that for some reason the plaintiffs have attempted to mutate into other claims, and that the complaint provides no set of facts from which this Court could grant relief under the Free Exercise Clause of the First Amendment.

Under 42 U.S.C. § 1983, the plaintiffs must establish that a person acting under color of state law deprived them of a right secured by the Constitution or laws of the United States. *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir.2001); *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir.1999). Section 1983 is not itself a source of substantive rights; rather, it provides a vehicle for vindicating rights provided by the Constitution. *Braley v. City of Pontiac*, 906 F.2d 220, 223 (6th Cir.1990).

The First Amendment states in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Although the text of the amendment limits its application to the United States Congress, the Supreme Court subsequently incorporated its strictures against the states and their political subdivisions. *See Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The Michigan Constitution has an analogous provision that affords, at a minimum, concomitant protection to religious liberties. *People v. DeJonge*, 442 Mich. 266, 273 n. 9, 501 N.W.2d 127, 131 n. 9 (1993). The Michigan Supreme Court has suggested that Michigan's constitution may provide greater protection than that provided by *Employment Div., Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), discussed below, but has applied *Smith* to date as the governing precedent under both clauses. *Id.* at 279, 501 N.W.2d at 134 n. 27.

In *Smith*, the Supreme Court reviewed a decision of the Oregon Supreme Court which held that the First Amendment prohibited the state from denying unemployment benefits to employees who were fired from their jobs for using peyote in religious ceremonies. The Court first summa-rized the contours of the Free Exercise Clause itself:

> The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires. Thus, the First Amendment obviously excludes all governmental regulation of religious *beliefs* as such. The government may not compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma.

*Smith*, 494 U.S. at 877–78, 110 S.Ct. 1595 (citations omitted). However, the Court rejected the respondents' attempt to take this analysis "one large step further" by forcing the state to carve out an exception to its drug laws for the respondents' religious benefit. Finding no support in its past jurisprudence for such a proposition, the Court concluded that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 879, 110 S.Ct. 1595 (citation omitted). Because the Oregon law was neutral on its face and no evidence existed that it was passed for the purpose of targeting the respondents' religious beliefs, the law was subject only to rational basis scrutiny. The law having passed that test, the Court found the respondents' challenge to be without merit.

Two years later, however, the Court struck down a municipal ordinance it found to have been passed with the intent of inhibiting an otherwise valid religious practice in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). In

that case, the Court heard the appeal of practitioners of the Santeria religion, which combines aspects of both traditional African and Roman Catholic religious practice. To ensure that the saints will protect them, Santeria practitioners sacrifice animals. In what the Court found to be an obvious response to target this practice, the City of Hialeah enacted an elaborate ordinance that banned animal sacrifices. Because the city ordinance, unlike the regulation in *Smith*, was enacted for the primary purpose of inhibiting a religious practice, it was subject to strict scrutiny and could not survive absent a compelling justification. *Id.* at 546–47, 113 S.Ct. 2217. The Court found the ordinance wanting in this respect, and reversed the contrary decision of the Eleventh Circuit.

Two Sixth Circuit cases have applied these principles in a manner particularly relevant to this case. In *Mount Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398 (6th Cir.1999), the plaintiff alleged that the City violated its right of free exercise by refusing to grant its request to rezone an area for a new Catholic cemetery. Even assuming that the Association had standing to raise such a claim, the Sixth Circuit found that no claim was stated. Recognizing that *Smith* logically extends to zoning decisions, the Court found no evidence of an intent to discriminate against Catholicism, and, given what it found to be rational basis of the City of Troy's zoning decision, affirmed the district court's decision granting summary judgment to the city. Also relevant is the Sixth Circuit's recent decision in *Prater v. City of Burnside, Ky.*, 289 F.3d 417 (6th Cir.2002). There, a church pastor sued the City of Burnside alleging that its decision to allow the development of a roadway on land sacred to the plaintiffs' church violated their free exercise rights. The Sixth Circuit rejected the claim, noting the

Supreme Court's holding that "the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." *Id.* at 427 (citing *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988)). "The Free Exercise Clause, therefore, does not entitle a religious organization to special benefits." *Id.* at 428. The Court recognized that the development effort would be unconstitutional if intended to subvert the plaintiffs' religious belief, but given the failure of the plaintiffs to demonstrate different treatment of a similarly-situated group, found that no claim for relief was stated.

■ In this case, the plaintiffs' theory that an official endorsement of one religion ipso facto constitutes a burden on the free exercise of others finds no support in the jurisprudence. *Prater* convincingly establishes that the government's refusal to rescind an otherwise constitutional program cannot, in and of itself, violate the Free Exercise rights of a religious group, even if it is disparately affected by the decision. *Id. Mount Elliott* holds that the ruling in *Smith*, contrary to the plaintiffs unsupported assertion that it is limited to criminal laws, applies to zoning decisions and, presumably, other municipal policy decisions as well. The plaintiffs do not allege that any action of Tuscola County has made it more difficult to practice their own religion; what they complain of is the hostile reaction they received after objecting to perceived favoritism toward another religion. The plaintiffs do not list any ritual or undertaking central to their religion or beliefs which has been hindered by the defendants' actions. The plaintiffs thus have failed to state a claim under the Free Exercise Clause, and count 1 of the amended complaint will be dismissed.

**B.**

In count 3 of the amended complaint, the plaintiffs state, in conclusory language, that their rights under the Due Process Clause of the Fourteenth Amendment have been abridged. The defendants argue that the amended complaint does not identify any liberty or property interest of which the plaintiffs have been deprived, and therefore no procedural due process claim is stated. The plaintiffs respond that they were never allowed to avail themselves of the procedures which facilitated expression of their dissenting views at the county Board meeting relating to the placement of the creche. They contend that their procedural due process rights were violated when they were not allowed to speak at the meeting, or to have the matter considered by the Board at a later date. They also complain that their reputations have been injured as a result of the Board's intolerance.

■ The Fourteenth Amendment to the United States Constitution forbids states and their political subdivisions from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const., amend XIV, § 1. If the plaintiff has no cognizable life, liberty, or property interest at stake, no process whatsoever is due. See Ashki v. I.N.S., 233 F.3d 913, 921 (6th Cir.2000) (noting that "in order to demonstrate that the Due Process Clause has been violated, Petitioner must establish that she has been deprived of a life, liberty, or property interest sufficient to trigger the protection of the Due Process Clause in the first place"); Seal v. Morgan, 229 F.3d 567, 574 (6th Cir.2000) ("There is no abstract federal constitutional right to process for process's sake.")

■ Citizens do have limited procedural due process rights with respect to legislative action. Generally speaking, legislative action is not subject to the notice and hearing requirements of the Due Process Clause; the legislative process itself provides all the process that is due. *Barefoot v. City of Wilmington*, 306 F.3d 113, 124 (4th Cir.2002). Nevertheless, the legislative process does provide some procedural protection, *see King Enters., Inc. v. Thomas Township*, 215 F.Supp.2d 891, 918 (E.D.Mich.2002), and the enforcement of legislation "passed" in violation of state law can violate the procedural due process rights of the affected citizens. *See Richardson v. Town of Eastover*, 922 F.2d 1152, 1158 (4th Cir.1991); *Conway v. Searles*, 954 F.Supp. 756, 766–67 (D.Vt. 1997). However, the Court has found no authority, and the plaintiffs have cited none, indicating that citizens have the constitutional right to hold a legislature at rapt attention for five minutes in order to criticize policy with which they disagree. There simply is no such liberty interest. Although the standards might be different if the Board were sitting in an administrative capacity, that is not at issue here because the plaintiffs' amended complaint does not challenge under this claim the procedure by which permits to use the courthouse lawn for displays were issued. Never having applied for such a permit, it is doubtful that the plaintiffs would have standing to make such a claim in any event.

Furthermore, the sullying of one's reputation, by itself, is not a cognizable liberty interest entitled to due process protection, nor is any loss of employment occasioned by the damage caused to one's reputation, unless the public entity in question has expressly forbidden the aggrieved individual the right to pursue her career of choice. *See Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir.1994) (finding that placement of sex offender on registration list denying her the right to work in the child care field implicated a liberty interest).

The Sixth Circuit has also been unreceptive to such claims, refusing to find a liberty interest resulting from harm to one's reputation unless "the stigmatizing statements [were] made in connection with the loss of a governmental right, benefit, or entitlement." *Med Corp., Inc. v. City of Lima,* 296 F.3d 404, 414 (6th Cir.2002) (finding that one-week suspension of dispatch calls to ambulance provider did not infringe on any of the provider's liberty interests).

■ No claim for relief is stated in count 3 of the amended complaint. At the December 11, 2001 meeting, the Board was not enacting legislation, and it was not adjudicating a permit request for use of a public forum to erect a display. Rather, it was hearing commentary—commentary that under federal law it has no obligation to entertain—from plaintiff Anonka that criticized the Board's decision to approve a display by a local women's group. Similarly, the demeaning of the plaintiffs' reputation, and the resulting loss of business to Anonka's museum that allegedly followed, is not itself a liberty interest that would entitle Anonka to procedural due process.

The deprivation of a recognized property, life, or liberty interest is a prerequisite to any claim for denial of procedural due process. *Id.* at 409. No claim is therefore stated.

### C.

The plaintiffs' claim under the Equal Protection Clause, advanced in count 4 of the amended complaint, fares better, at least at this stage of the proceedings. The plaintiffs contend here that they were denied the right to speak out against the creche at the county Board meeting because of their religious beliefs. The defendants argue that the plaintiffs have not alleged that they are part of a discernable class or group, which is fatal to their claim,

and further that the reactions of individual Board members do not constitute an equal protection violation. The plaintiffs respond that they suffered discriminated because they are "witches," which is gender-based.

■ Regardless of whether the plaintiffs have alleged that they belong to a group of "witches," "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure *every person* with the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (emphasis added). The Equal Protection Clause protects all classes of citizens, even a class of one, from irrational and arbitrary government behavior. *Ibid.* (finding claim for equal protection to be violated when the municipality demanded an easement twice as large from the plaintiffs as from others, and where the demand was alleged to be motivated by animus only).

■ A claim that a citizen has been stifled from speaking because of her membership in a class can be brought under both the First Amendment and the Fourteenth Amendment. *See Pesek v. City of Brunswick,* 794 F.Supp. 768, 783 n. 6 (N.D.Ohio 1992) (collecting cases). Here, the plaintiffs allege that they were denied access to a public forum on the basis of their religious viewpoint. In *Kincaid v. Gibson,* 236 F.3d 342 (6th Cir.2001) (en banc), the court of appeals analyzed the decisions in *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *Rosenberger v. Rector and Visitors of University of Virginia,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *Arkansas*

*Education Television Commission v. Forbes,* 523 U.S. 666, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998); *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), concluding that the Supreme Court has recognized three types of fora for speech:

> The first type is a traditional public forum. A traditional public forum is a place "which by long tradition or by government fiat ha[s] been devoted to assembly and debate," such as a street or park. In traditional public fora, "the rights of the state to limit expressive activity are sharply circumscribed": the government may enforce content-based restrictions only if they are narrowly drawn to serve a compelling interest, and may enforce content-neutral time, place, and manner regulations only if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." The second type of forum has been alternatively described as a "limited public forum," and as a "designated public forum." The government may open a limited public forum "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." Although the government need not retain the open nature of a limited public forum, "as long as it does so it is bound by the same standards as apply in a traditional public forum." The third and final type of forum is a nonpublic forum. The government may control access to a nonpublic forum "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."

*Id.* at 348 (finding school yearbook to be limited public forum not subject to blanket censorship on the basis of viewpoint) (internal citations omitted). A city council meeting is the quintessential limited public forum, especially when citizen comments are restricted to a particular part of the meeting. *See Gault v. City of Battle Creek,* 73 F.Supp.2d 811, 814 (W.D.Mich. 1999) (granting the plaintiffs' motion for a preliminary injunction against further interference with their right to speak at council meetings about a police chief's alleged misconduct); *Pesek,* 794 F.Supp. at 782 (finding that firefighter was unconstitutionally forbidden from addressing the city council on the basis of his employment status). The county Board, in this situation, does retain substantial control over the manner in which citizen comments are presented. Citizen commentary can be suppressed if it becomes "irrelevant or repetitious, or disrupts, disturbs or otherwise impedes the orderly conduct of the Council meeting, so long as the speaker is not stopped from speaking because the moderator disagrees with the viewpoint he is expressing." *Gault,* 73 F.Supp.2d at 814 (citing *White v. City of Norwalk,* 900 F.2d 1421, 1425–26 (9th Cir.1990)) (internal quotation marks omitted).

■ The plaintiffs allege in their complaint that other, Christian citizens were permitted to speak for five minutes during the public comment period during the December 11, 2001 meeting (or perhaps other meetings), but the plaintiffs were not similarly allowed to express their views, and that the suppression was based on the religious (or anti-religious) content of their speech. Those allegations state a prima facie violation of both the First Amendment and the Fourteenth Amendment, and therefore the amended complaint states a claim upon which relief can be granted. There may be serious questions as to whether being shouted down at a meeting by individual Commissioners constitutes being suppressed by the Board *itself,* but

that is a fact issue that will have to be addressed later in the litigation.

## D.

In count 5 of the amended complaint, the plaintiffs allege that the defendants violated a variety of state laws by allowing the religious holiday displays and in the manner in which plaintiffs' protests were handled. Specifically, the plaintiffs claim that the defendants violated their constitutional oath of office, Mich. Comp. Laws § 15.151; bond requirements; laws governing boards of commissioners, Mich. Comp. Laws § 46.1 *et seq.;* Michigan's Open Meetings Act, Mich. Comp. Laws § 15.261 *et seq.;* the Standards of Conduct for Public Officers and Employees, Mich. Comp. Laws § 15.341 *et seq.;* Conflict of Interest laws, Mich. Comp. Laws § 15.301 *et seq.;* the *International Covenant on Civil and Political Rights,* art. 7, 999 U.N.T.S. 171 *et seq.* (entered into force March 23, 1976); and various "[a]dditional laws of the U.S., Michigan, and Tuscola County," Am. Compl. ¶ 98. The defendants argue that the plaintiffs have failed to explain how these state law violations can give rise to a private right of action, that no federal cause of action is stated, and that the International Covenant on Civil and Political Rights does not have the force of law, nor does it provide a basis for an action under 42 U.S.C. § 1983. The plaintiffs respond that local officials violating state laws deny citizens their due process rights, guaranteed by federal law.

 Violations of state law do not, by themselves, give rise to a federal cause of action under 42 U.S.C. § 1983. *See Baker v. McCollan,* 443 U.S. 137, 146–47, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (affirming that wrongdoing under state law does not automatically become a basis for federal relief simply because a public official was involved). A substantive due pro-

cess claim can never arise merely because a state statute has been violated. *See Coyne v. City of Somerville,* 972 F.2d 440, 444 (1st Cir.1992). The plaintiffs cite no authority to the contrary.

 Nor have the plaintiffs demonstrated that any of the statutory schemes they cited, save the Michigan Open Meetings Act, will support a private right of action. As for the Michigan Open Meetings Act, Mich. Comp. Laws § 15.261 *et seq.,* the amended complaint does not plead facts establishing a violation. The purpose of the Act is to ensure that decisions are truly deliberated in public, and to prevent public meetings from merely rubberstamping decisions already made in private. *Schmiedicke v. Clare Sch. Bd.,* 228 Mich.App. 259, 264, 577 N.W.2d 706, 709 (1998). In order to state a claim under the Act, a party must state both a specific violation of the Act and proffer facts to explain how the rights of the public were compromised by the violation. *See Knauff v. Oscoda County Drain C'mmr,* 240 Mich. App. 485, 495, 618 N.W.2d 1, 7 (2000). Mere recital in the complaint that the rights of the public were impaired is insufficient. *Nicholas v. Meridian Charter Twp. Bd.,* 239 Mich.App. 525, 533, 609 N.W.2d 574, 579 (2000) (affirming trial court decision that rights of the public were not compromised, as there was substantial compliance with the Act and the issues were actually addressed in the open before the public). If the Act's requirements were violated, but the rights of the public were not compromised, the party bringing suit may still recover attorney fees and costs. *Id.* at 536–37, 609 N.W.2d at 580–81. However, only "meetings" are covered by the Act. A "meeting" occurs only when (1) a quorum of the public body's members are present, (2) a decision is deliberated or rendered, and (3) the decision concerns a matter of public policy.

*Ryant v. Cleveland Twp.*, 239 Mich.App. 430, 434, 608 N.W.2d 101, 103–04 (2000). Chance gatherings are not covered by the Act, nor are gatherings at which individual board members state opinions on public issues, but no decision or discussion ensues. *Id.* at 434–36, 608 N.W.2d at 103–04. Furthermore, the Act does not preclude the informal "canvassing" by a board member of other board members' likely votes on an issue. *St. Aubin v. Ishpeming City Council*, 197 Mich.App. 100, 102–03, 494 N.W.2d 803, 804–05 (1992).

 In this case, the amended complaint contains no allegations that a secret, or "non-open," meeting the county commissioners ever occurred. Rather, the plaintiffs have acknowledged that the Board meeting of December 11, 2001 was an "open meeting," Am. Compl. ¶¶ 44, 50, and complain that the defendant commissioners never allowed the plaintiffs to speak at *another* meeting. *Id.* ¶ 58. The plaintiffs also complain that no vote was taken in light of the plaintiffs' public comments. *Id.* ¶ 66. These allegations do not suggest a violation of Michigan's Open Meetings Act.

 Likewise, the International Covenant on Civil & Political Rights (ICCPR) does not give rise to a private cause of action. Treaties are only cognizable in federal courts if they are either self-executing or Congress has passed appropriate enabling legislation. *United States v. Duarte–Acero*, 296 F.3d 1277, 1283 (11th Cir.2002). The ICCPR meets neither of these criteria. *See Buell v. Mitchell*, 274 F.3d 337, 372 (6th Cir.2001) (declining to bar the petitioner's execution per the ICCPR, even if its provisions are construed to outlaw the death penalty). Accordingly, no private cause of action can be brought under its auspices. *See Igartua De La Rosa v. United States*, 32 F.3d 8, 10 n. 1 (1st Cir.1994) (dismissing lawsuit seeking permission for Puerto Rican citizens to vote in United States presidential elections).

Count 5 of the amended complaint fails to state a cognizable claim, and it will be dismissed.

## E.

Counts 6 and 7 of the amended complaint are ostensibly based on violations of 42 U.S.C. §§ 1985 and 1986, presumably grounded in the contention that the defendants conspired with others, or failed to prevent a conspiracy, to deprive the plaintiffs of the equal protection of the laws. The defendants argue that no claim is stated because the plaintiffs fail to allege an actual agreement, and religious animus cannot form the basis for relief under § 1985(3), which both parties agree is the applicable section of the statute.

 The pertinent statutory provisions state:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such

wrongful act, which such person by reasonable diligence could have prevented. 42 U.S.C. § 1986. To state a claim under Section 1985(3), the complaint must allege (1) an agreement of two or more persons (2) for the purpose of depriving a person or class of persons of the equal protection of the laws or the equal privileges and immunities under the laws, and (3) an act in furtherance of the conspiracy (4) whereby the person is injured or deprived of a right or privilege. *Johnson v. Hills & Dales Gen. Hosp.,* 40 F.3d 837, 839 (6th Cir.1994). A conspiracy claim must allege that the defendants in question actually agreed to conspire against the plaintiff or plaintiffs. *Smith v. Thornburg,* 136 F.3d 1070, 1078 (6th Cir.1998) (rejecting § 1985 conspiracy claim, in part because the traffic stop in question happened so fast that it was impossible for the officers accused to have had time to conspire with one another against the plaintiff). Similarly, the existence of a § 1986 claim depends upon the existence of a valid § 1985 claim. *Bartell v. Lohiser,* 215 F.3d 550, 560 (6th Cir.2000) (summarizing holdings in this Circuit to that effect). These sections address both public *and* private conspiracies to deprive others of their civil rights. *See Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (summarizing past rulings of the court).

Contrary to the defendants' assertion, claims under these statutes are not limited to those based on racial animus. In *Bray,* for instance, the Supreme Court refused to rule out women as a class under Section 1985, but rejected the notion that opposition to abortion itself is the functional equivalent of invidious discrimination against women. *Id.* at 269–70, 113 S.Ct. 753. The Sixth Circuit has made it clear that religious discrimination is among the categories of discrimination protected by Section 1985(3). *See Browder v. Tipton,*

630 F.2d 1149 (6th Cir.1980). In that case, the plaintiffs alleged that they were falsely arrested due to the efforts of adversaries in a labor dispute, and that the false arrest was actionable under § 1985(3) because they were a "class" denied equal protection. After reviewing the text and history of the statute, the court found particularly persuasive the assertion of the Senate manager of the bill that the conduct being targeted would include a "conspiracy ... formed against this man because he was a Democrat ... or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter." *Id.* at 1151 (citing Statement of Senator Edmunds, Cong. Globe, 42d Cong., 1st Sess. 567, 695–96 (1871)). The Court also noted a past decision in this Circuit affirming a § 1985(3) conspiracy finding against certain individuals on the ground that they conspired to deprive certain citizens of their civil rights because they were Jewish. *Id.* at 1152 (citing *Marlowe v. Fisher Body,* 489 F.2d 1057 (6th Cir.1973)).

However, the defendants correctly argue that plaintiffs' amended complaint is wanting because of the failure to adequately allege an agreement. There is no suggestion that the defendants' conspired to deprive these plaintiffs of any rights when the initial request to display the creche was approved. Likewise, the amended complaint does not allege any agreement among Board members reached for the purpose of depriving the plaintiffs of their equal protection rights at the Board meeting. Rather, it alleges that the plaintiffs were shouted down by individual Commissioners after plaintiff Anonka rose to reiterate her complaints earlier stated in a letter to the Board that demanded the creche be dismantled immediately. This allegation suggests an act of spontaneous anger, not cool deliberation from which a prior agreement can be inferred. The

plaintiffs' response to this motion incorrectly asserts that the amended complaint alleges that the Commissioners met before the meeting in violation of the Open Meetings Act to conspire against the plaintiffs. The pleading contains no such allegation, and the plaintiffs may not amend their complaint through a response brief. *See Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir.1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

It is doubtful that a proper allegation of an agreement among county commissioners would suffice in any event, since the Sixth Circuit has enforced the intracorporate conspiracy doctrine against § 1985 claims when the alleged misconduct was committed by municipal employees acting within the scope of their employment. *See, e.g., Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.,* 926 F.2d 505, 509–10 (6th Cir.1991) (finding no claim to have been stated when the alleged § 1985(3) conspiracy arose between the school superintendent, the executive director of the district, and a school administrator).

Finally, the plaintiffs make no allegations in the amended complaint about any active involvement by Commissioners in subsequent activities against the plaintiffs. The so-called prayer rally held on December 20, 2001 was allegedly only permitted to "go on" by the Commissioners, Am. Compl. ¶ 52, and the amended complaint does not allege or allow an inference that the Commissioners were behind an alleged "boycott" of Anonka's "educational" museum of witchcraft. *See* Am. Compl. ¶ 54.

Count 7 of the amended complaint will be dismissed.

### F.

The parties have agreed that count 8 of the amended complaint, purporting to state a claim under the Americans With Disabilities Act, ought to be dismissed.

The defendants' motion to dismiss will therefore be granted with respect to counts 1, 3, 5, 6, 7 and 8 of the amended complaint. The motion is denied as to count 4, since the amended complaint states a claim under the Equal Protection Clause. Count 2, which is at the core of the dispute, is the subject of the defendants' motion for summary judgment, discussed below.

### III.

Count 2 of the amended complaint contains allegations that the display of the creche on the county courthouse lawn violates the Establishment Clause of the First Amendment. The defendants argue that they are entitled to summary judgment as a matter of law because the undisputed facts show that the display is privately owned and maintained, the creche itself is part of a larger holiday display, and the land on which it is displayed is a public forum. The plaintiffs also claim that they are entitled to summary judgment.

### A.

Before considering the merits of the defendants' motion, the Court turns first to the plaintiffs' claim stated in their motion for relief from the case management order, since the plaintiffs suggest that additional facts may be yet undiscovered that would have a bearing on the issues. Federal Rule of Civil Procedure 56(f) provides that if "it [should] appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a contin-

uance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." The plaintiffs have not specifically invoked this rule, but they say that certain documents have been withheld from them which may have a bearing on the historical treatment of requests to use the public space around the courthouse in general, and specific requests to erect holiday displays with religious themes.

Because the plaintiffs' request is made in the context of the discovery which has already occurred or been attempted, some background facts are in order here. This case was filed on December 17, 2001. The plaintiffs submitted a Request for Production of Documents in January 2002 to which the defendants submitted a response along with various documents on January 25, 2002. The defendants also filed a motion for a protective order after receiving a series of subpoenas duces tecum and notices of deposition for submission upon various members of the defendant Board and others. The Magistrate Judge granted the motion for protective order in part on January 31, 2002, allowing the plaintiffs to take the depositions of Michael Hoagland, the Comptroller of Tuscola County; Norma Bates, Chairperson of the Tuscola County Board of Commissioners; Margie White–Cormier, the Tuscola County Clerk; and Sharon Carroll, a former employee of the Tuscola County Buildings and Grounds Department. Not satisfied with the defendants' response to their document request, the plaintiffs filed a motion to compel responses to their production requests on March 25, 2002, and the matter was addressed at the Court's scheduling conference on April 10, 2002. The Court then issued its scheduling order, which stated in part that:

> Plaintiffs may inspect municipal records on site during normal business hours, provided plaintiffs bear the reasonable

costs incurred by the defendant of providing a single employee to gather records and attend the inspection. The records shall consist of minutes of the meeting of the Board of Commissioners, requests and applications for use of county property; permits for use of county property; documents constituting denial of such permits; and invoices, warrants and payment vouchers for the purchase or sale of religious figures displayed on public land. This inspection shall occur on or before **April 30, 2002.**

Case Management Order, 4/10/02, at 3. The Order further directed the plaintiffs to complete all depositions permitted by Magistrate Judge Binder by May 24, 2002, and to file their materials with respect to expert witnesses by May 28, 2002. *Id.* at 1, 4. Discovery was to be completed by July 1, 2002, and dispositive motions were to be filed by July 15, 2002, along with any motions challenging experts.

With leave of the Court, the plaintiffs filed their amended complaint on April 16, 2002. Plaintiffs' counsel then spent three days, April 24, 26, and 30, 2002, inspecting documents at county facilities, but expressed dissatisfaction at the documents produced for their review. Order Pursuant to Status Conference, 6/7/2002, at 1–2. After the parties contacted the Court to announce a discovery impasse, the Court convened a status conference on June 4, 2002.

On June 4, 2002, the parties appeared in chambers as directed. The plaintiffs acknowledged that they had not served expert reports required by Rule 26(a)(2)(B) and the Case Management Order, nor had they completed the depositions allowed by the magistrate judge. They explained that they believed that the defendants were withholding documents from them, and the plaintiffs preferred to have those docu-

ments before deposing any witnesses, and they needed the witness testimony before their experts could draft reports. The Court found that the plaintiffs had failed to meet the Court-imposed deadlines for taking all desired depositions and for submitting expert reports, held that the plaintiffs had therefore forfeited their opportunities to depose the witnesses listed above, and precluded experts because of the violation of Rule 26(a)(2)(B). *See* Federal Rule of Civil Procedure 37(c). However, the Court permitted the plaintiffs to file a motion for relief if they could demonstrate that their suspicions of material evidence being withheld by the defendants turned out to be well-founded. *See id.* at 3, 4–5. To advance that end, the Court permitted the plaintiffs one additional day of document examination to take place by June 15, 2002 and to take the deposition of the Tuscola County Clerk, Margie White–Cormier. *Id.* at 2, 3. Magistrate Judge Binder's Order entered June 12, 2002 indicates that the plaintiffs were granted two days of document examination, which included Building and Grounds Committee records, old meeting agendas, and meeting minutes.

The plaintiffs deposed Ms. White–Cormier over two days, June 17, 2002 and June 26, 2002, at which time the plaintiffs appear to have probed the record keeping practices of the County with respect to requests for public property, as well as other areas of interest to them. The defendants filed their motion to dismiss on June 18, 2002, and moved for summary judgment on July 11, 2002. The plaintiffs filed their motion for relief on July 15, 2002, as well as a response to the defendants' motion for summary judgment and their own motion for summary judgment.

On October 25, 2002, the plaintiffs filed an "Update/Supplement to Summary Judgment Record" that includes an affidavit from a private investigator detailing a conversation he had with a Mr. Donald Frazee, who apparently works for the defendants and is in charge of putting up holiday decorations on the Tuscola County courthouse lawn. David Norris Aff. ¶ 2. Frazee allegedly told Norris that parts of the nativity scene were stored in the "barn at the sewer plant," the basement of the Downtown Development Authority building, and Caro High School. *Id.* ¶¶ 4–6. Along with this affidavit, the plaintiffs filed a request for physical inspection of the "Creche Barn" and the storage locations for the pieces of the creche. Motion Requesting Physical Inspection, filed 10/25/02, at 1.

After all the document inspection sessions and the deposition of the county clerk, the plaintiffs list four matters which they claim were withheld from them, in order to justify relief from the Court's preclusion order: (1) the "Clerk's 'notes' from 12/11/01"; (2) the "Clerk's (initial) 'minutes'" from the 12/11/01 meeting; (3) "all 'complaints' regarding uses of Tuscola Co. government facilities"; and (4) "all 'requests, action taken ... correspondence, notes, complaints, media, and comments,' regarding the creche and other displays including 'Michigan Sugar donated (soldiers/Caro DDA) display.'" Pl.'s M. for Relief, at 5–6. These document requests were among the fifteen categories in the plaintiffs' initial Request for Production of Documents. None of these items, however, justifies relief under Rule 56(f).

Rule 56(f) may be invoked only when the plaintiff has been unable to acquire needed discovery through due diligence, not to permit further discovery when the plaintiff had failed to thoroughly examine her opportunities in the time available to her. *See First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 298, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) (noting that despite the plaintiff's "complaints

about the limitations placed upon his discovery of materials and witnesses, it is evident that he has had sufficient discovery" to determine whether his claims had merit). The burden of establishing the need for further discovery rests upon the party advancing the request. *Abercrombie & Fitch Stores, Inc. v. Amer. Eagle Outfitters, Inc.*, 280 F.3d 619, 627 (6th Cir.2002). When the questions before the Court are primarily ones of law and the additional requested discovery would not affect the resolution of those questions, this Court may properly deny the Rule 56(f) request. *United States v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir.2002) (finding, on that basis, that an intervening newspaper's request for further discovery was properly denied). The request may also be denied if the party requesting further discovery is unable to explain how the discovery would counter the moving party's showing of the absence of a genuine issue of material fact. *Singleton v. United States*, 277 F.3d 864, 872 (6th Cir.2002) (affirming district court's denial of motion for further discovery when such a showing was not made). *See also Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1114 (6th Cir.2001) ("Where the full period for pretrial discovery has run its course, a party should generally be precluded from reopening discovery months after it has closed in a last-ditch attempt to salvage a deficient claim or defense.")

Here, none of the items enumerated by the plaintiffs justify their failure to take the depositions of the witnesses allowed by the magistrate judge, or their failure to submit their Rule 26(a)(2)(B) disclosures, or an extension of discovery because of an inability to respond to the defendants' summary judgment motion. The Clerk's notes would have been included in one of the first document requests for the production of any "notes" taken by Commissioners at the meeting the plaintiffs attended on December 11, 2001. Apparently mistakenly understanding that no such notes were kept other than the formal minutes, the defendants' initial response was that no such notes were available. The plaintiffs inaccurately assert that these notes were "withheld and not produced until just recently," Pl.'s Br. at 6, but the fact is that defense counsel learned of the notes in April, and immediately copied and forwarded them to the plaintiffs' counsel. Nothing material existed therein; the notes were little more than an attendance list.

Likewise, little material of substance is found in the initial "draft" minutes. The minutes of the December 11, 2001 meeting were immediately requested upon the filing of the lawsuit. The *final*, actual minutes were promptly provided. Independently, Plaintiff Tammra Jocham had visited the county clerk's office in January 2001 to obtain a copy of the minutes; she was provided a copy of the "draft" minutes rather than the final version. *See* Tammra Jocham Aff., 4/7/02, Pl.'s Motion for Relief att. 3. As the plaintiffs themselves have acknowledged, "draft" versions of the minutes typically are prepared, made available to the public, and addressed and approved at the next Board meeting. When any corrections are needed, a final version is completed, superseding the draft. The clerk's office then makes the final version available, but in this instance Ms. Jocham obtained her copy of the minutes before the draft version had been replaced. This minor oversight was explored and explained in the plaintiffs' interrogation of Ms. White–Cormier. White–Cormier Dep. at 131–36, Defs.' Resp. Br. ex. 2. Because the plaintiffs, in fact, have had both versions of the subject minutes since January 2002, these circumstances do not provide the plaintiffs with any basis for extending discovery at

this late date. Nor do the plaintiffs demonstrate how this difference in note drafts is probative of their claims.

The plaintiffs also sought all complaints regarding use of Tuscola County property and the Michigan Sugar display. This dispute has existed throughout the lawsuit, and was brought before the Court at the April Status and Scheduling Conference. The resulting order *did not* require inquiry into citizen "complaints" regarding use of Tuscola County property. Furthermore, since the plaintiffs have reviewed *all* of the defendants' Board and committee minutes, they have all of the references therein to the Michigan Sugar display of toy soldiers, submitted by the Caro Downtown Development Authority ("DDA"). The plaintiffs even took depositions of three different DDA representatives. There is no need to revisit this issue here. No materiality of these past complaints has been shown. Either the creche displayed in December, 2001 violated the Constitution or it did not—the relevance of past displays and the motives behind them has not been demonstrated.

The motion for relief from the case management order will be denied. There is no need to reopen discovery, nor have the plaintiffs shown an inability to respond to the defendants' summary judgment motion under Rule 56(f).

### B.

Turning now to the merits of the parties' cross-motions for summary judgment directed toward count 2 of the amended complaint, the parties do not dispute that a motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.,* 260 F.3d 574, 581 (6th Cir.2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler,* 215 F.3d 594, 599 (6th Cir.2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.,* 14 F.3d 1143, 1148 (6th Cir.1994) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 943 (6th Cir.2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Simmons–Harris v. Zelman,* 234 F.3d 945, 951 (6th Cir.2000). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.1993); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.,* 190 F.3d 768, 772 (6th Cir.1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Univ., Inc.*, 276 F.3d 845, 848 (6th Cir.2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir.2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir.1991).

The crux of this dispute is whether the defendants' decision to permit the Caro Women's Interfaith Committee for Christmas to erect a nativity scene on the courthouse lawn violated the Establishment Clause of the First Amendment to the United States Constitution. The plaintiffs argue that this action constitutes an endorsement of religion by a governmental entity, and that they are therefore entitled to a judgment as a matter of law declaring the action unlawful and enjoining its continued display. The defendants contend that the undisputed facts demonstrate that although the display is on public land, it is privately owned and maintained, the creche is part of a larger seasonal display such that a reasonable observer would not perceive that the county is endorsing religion, and the area constitutes a traditional public forum in which all speech, including religious speech, must be tolerated. They are entitled, they claim, to a judgment as a matter of law that the allowance of the display does not contravene the Establishment Clause.

 Although the Supreme Court has considered cases over the years dealing with the placement of nativity scenes on public property, and decided issues which have fractured the Court, *see, e.g., Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984); *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), the preeminent test to apply to Establishment Clause violation cases remains the one announced in *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *See Adland v. Russ*, 307 F.3d 471, 479 (6th Cir.2002) ("While we have recognized that individual Supreme Court justices have expressed reservations regarding the *Lemon* test, *see American Civil Liberties Union of Ohio v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289, 306 & n. 15 (6th Cir.2001) (collecting opinions), we are an intermediate federal court and are bound to follow this test until the Supreme Court explicitly overrules or abandons it."). The *Lemon* test requires the court to consider whether (1) the government activity in question has a secular purpose, (2) the activity's primary effect advances or inhibits religion, and (3) the government activity fosters an

"excessive entanglement" with religion. *Lemon,* 403 U.S. at 612, 91 S.Ct. 2105. The Sixth Circuit has acknowledged that the Supreme Court occasionally has articulated what has come to be known as the "endorsement test," but this test has never been considered as replacing the three-pronged analysis prescribed by *Lemon:* "While we have variously interpreted the endorsement test as a refinement or modification of the first and second prongs, and as a modification of the entire *Lemon* test, we follow our en banc decision in *Americans United for Separation of Church and State v. City of Grand Rapids,* 980 F.2d 1538 (6th Cir.1992), and the recent panel decisions in *Brooks v. City of Oak Ridge,* 222 F.3d 259, 264 (6th Cir.2000), *cert. denied,* 531 U.S. 1152, 121 S.Ct. 1097, 148 L.Ed.2d 970 (2001), and *Granzeier [v. Middleton,* 173 F.3d 568, 573 (6th Cir. 1999) ], and treat the endorsement test as a refinement of the second *Lemon* prong." *Adland,* 307 F.3d at 479 (citations omitted).

■■■ Because the display is privately funded and located in an area where public expression has traditionally been allowed, there is another aspect of the First Amendment that must be considered as well, since content-based "regulation of speech on government property that has traditionally been available for public expression is subject to the highest scrutiny." *International Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). "The Establishment Clause, properly understood, is a shield against any attempt by government to inhibit religion as it has done here.... It may not be used as a sword to justify repression of religion or its adherents from any aspect of public life." *McDaniel v. Paty,* 435 U.S. 618, 641, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (Brennan, J., concurring) (foot-

note and citation omitted) (quoted in *Americans United for Separation of Church & State v. City of Grand Rapids,* 980 F.2d 1538, 1542 (6th Cir.1992)). Thus, it may be unconstitutional for the county *not* to allow a private citizen to display the nativity scene on public land. "As Justice O'Connor has stated, 'there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.'" *Americans United,* 980 F.2d at 1545 (quoting *Bd. of Educ. of Westside Cmty. Schs. v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (O'Connor, J.) (plurality opinion)). This conclusion has been underscored by the Supreme Court's subsequent decision in *Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 107, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (holding that school could not exclude from use of its facilities a Christian club for children when it had made its facilities a limited public forum for after-school activities). Further, the county's concern over an Establishment Clause challenge may not be used as a justification to deny a request to utilize a traditional public forum to display a message with religious content. *See Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 769, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (plurality opinion).

1.

■■■ In this case, the obvious purpose of the display on the courthouse lawn was to memorialize the Christmas season, which includes both religious and secular holidays. If the area in front of the county courthouse is in fact a public forum and the display is privately owned, then there is little difficulty finding that the first and third prongs of the *Lemon* test are satisfied. *See Americans United,* 980 F.2d at

1543 ("No one seriously questions whether the first two [sic] aspects of this test have been violated. Grand Rapids's policy of treating religious speech the same as all other speech certainly serves a secular purpose. The establishment of a public forum is a laudable goal, and part of a worthy tradition dating back to the Greek agora and the Roman forum.").

a.

. The plaintiffs claim that the area cannot be considered a public forum because it has never been officially designated as such, the county has colluded in the erection of the private display, and some have been prevented from using the area which, thus, is not open to all viewpoints. As to the first point, the designation of the area as a forum need not be the result of a formal act or ordinance. Tradition alone will suffice. *Pouillon v. City of Owosso*, 206 F.3d 711, 716–17 (6th Cir.2000) (finding that whether city hall steps were a public forum for speech depended on how they "had been used in the past, whether made available to demonstrations or not").

Second, the defendants' unrebutted affidavits establish that the courthouse lawn is a traditional public forum. The defendants have asserted that the Board has yet to reject a single request for use of the property, and the property has been used for everything from weddings to candlelight vigils to campaign rallies. The plaintiffs assert that the Ku Klux Klan was precluded from using the property, but their only evidence for this contention comes from the affidavit of a community member who asserts that he only saw the Klan down the street from the courthouse, not on the courthouse lawn itself. *See* Eric Johnson Aff. ¶ 10, Pls.' S.J. Ex. 10. Such a statement does not mean that the lawn was not also used, much less that the Board denied the request. It is obvious

that the Board found the request enormously distasteful, but they still appear to have granted access to the public forum.

Third, the plaintiffs' assertion that the courthouse lawn is disqualified as a public forum by the presence of collusion between the CWICC and the Board, and by the fact that the lawn is allegedly not open to all viewpoints, is simply not supported by any evidence on this record. The defendants have credibly established that the lawn is a public forum used by all without any content-based restriction. The minute entries attached to their motion support their allegations. Thus challenged, the plaintiffs must come forward with *evidence* to indicate that the exceptions they cite are actually present. Denying the defendants' assertions is not enough. *See Street*, 886 F.2d at 1479.

The plaintiffs' collusion argument is based on the fact that the minutes frequently do not indicate that a formal request to erect the creche was brought up at all, and if they do, it appears as if Board members make the request on behalf of the CWICC. The problem with this argument is that the plaintiffs are essentially relying on a lack of evidence as a substitute *for* evidence. The lack of minute entries do not raise a genuine dispute of material fact as to whether the lawn was open to all who applied for its use, or that the Board somehow spontaneously granted the CWICC permission to erect a religious display. The plaintiffs' accompanying assertion that the lawn is not open to all viewpoints is similarly speculative, and is undermined by their acknowledgment that they cannot provide the name of a single person who applied to use the lawn and had the request denied. The speculation of individual citizens who considered applying for a permit is not enough. Similarly, the fact that, in 1989, a citizen complained about the creche through another

attorney does not raise a genuine issue of material fact as to individuals' ability to use the lawn for their own purposes.

The Court finds no material factual dispute on the question of whether the courthouse lawn is a public forum. It is.

### b.

Similarly, there is no factual dispute that the creche was privately owned. The receipts attached to the defendants' affidavits demonstrate that all of the equipment was purchased by the CWICC, and the plaintiffs have presented no evidence that county employees are maintaining or erecting the nativity scene. The plaintiffs do allege that the Downtown Development Authority has its own display, and also asserted in a "supplement" to their motion answer that certain creche artifacts were being housed in DDA facilities; but the plaintiffs are not suing the DDA. The DDA is a quasi-public organization that spends both tax assessments and private donations. The plaintiffs also complain about taxpayer-subsidized electricity to illuminate the display, but fail to recognize that in Americans United the court found no entanglement due solely to providing electricity to illuminate the menorah in that case.

### c.

Because the CWICC's creche was erected in a traditional public forum, and it was privately owned, the Court finds that the activity of maintaining a public forum in which, among other things, holiday artifacts were displayed constitutes a proper, secular purpose. Further, because the activity allowed in this area was not regulated on the basis of content and the display was privately owned, there is no excessive entanglement with religion.

### 2.

As observed by the Sixth Circuit in Adland v. Russ, the second prong of the Lemon test has been refined by the endorsement test, which asks "whether a reasonable observer would believe that a particular action constitutes an endorsement of religion by the government." Adland, 307 F.3d at 479. Put another way, the question for determination is whether "the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." Allegheny County v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 597, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (opinion of Blackmun, J.)

In addressing this question, the Court is informed by several Supreme Court and Sixth Circuit decisions which provide guidance. In Lynch v. Donnelly, the Supreme Court held that a city's display of a creche in a park owned by a nonprofit organization as part of a holiday display which included a Christmas tree, carolers, a Santa Claus house, reindeer pulling a Santa's sleigh, candy-striped poles, cutout figures representing a clown, an elephant, and a teddy bear, hundreds of colored lights, and a large banner reading "Seasons Greetings" did not violate the Establishment Clause. 465 U.S. at 671, 104 S.Ct. 1355. Justice O'Connor, concurring, acknowledged that the creche was a religious symbol but reasoned that the display, when viewed in the context of the larger holiday setting, did not convey an endorsement of religion. Id. at 692, 104 S.Ct. 1355. Rather, the display memorialized a public holiday with strong secular components. Ibid.

In 1989, the Supreme Court considered another Establishment Clause challenge to a nativity scene, this time located on the "Grand Staircase" of a county courthouse, and a Chanukah menorah located in front of the city-county building. See Allegheny, 492 U.S. at 581–82, 109 S.Ct. 3086. Jus-

tice Blackmun, writing for a majority, held that the creche display violated the Establishment Clause, *id.* at 598–602, 109 S.Ct. 3086, and in several separate opinions, the Justices agreed that the menorah was constitutionally permissible, *see id.* at 613–621, 109 S.Ct. 3086 (Blackmun, J.); *id.* at 632–37, 109 S.Ct. 3086 (O'Connor, J., concurring); *id.* at 655–679, 109 S.Ct. 3086 (Kennedy, J., dissenting in part, concurring in part, joined by Rehnquist, C.J., White, J., Scalia, J.). In declaring the creche display unconstitutional, the Court focused on the location of the display in the "most beautiful" and "most public" area of the courthouse, concluding that this placement conveyed an "unmistakably clear" religious message and that "nothing in the context of the display detracts from the creche's religious message." *Id.* at 579, 598, 109 S.Ct. 3086. According to the Court, the presence of other secular Christmas decorations in other areas of the county courthouse "fail[ed] to negate the endorsement effect of the creche" because they were not part of the display on the Grand Staircase. *Id.* at 598 n. 48, 109 S.Ct. 3086. Although there was a floral display surrounding the creche, it only drew attention to the creche's religious message and thus "contribute[d] to, rather than detract[ed] from, the endorsement of religion conveyed by the creche." *Id.* at 599, 109 S.Ct. 3086. The Court explained: "No viewer could reasonably think that it occupies this location without the support and approval of the government. Thus, by permitting the 'display of the creche in this particular physical setting,' the county sends an unmistakable message that it supports and promotes the Christian praise to God that is the creche's religious message." *Id.* at 599–600, 109 S.Ct. 3086 (quoting *Lynch,* 465 U.S. at 692, 104 S.Ct. 1355 (O'Connor, J., concurring) (footnote omitted)).

Justice Blackmun, writing for himself, concluded that the display of the menorah was constitutional because it was not an exclusively religious symbol, but rather had a secular message as well as religious dimensions. *Id.* at 613–14, 104 S.Ct. 1355. In addition he believed that the forty-five-foot Christmas tree, a secular symbol in his view, was the "predominant element in the city's display" because of its size and location within the rest of the display. *Id.* at 617, 104 S.Ct. 1355. Justice O'Connor disagreed with Justice Blackmun's assessment of the menorah, but concluded nonetheless that its display did not violate the Establishment Clause. *Id.* at 632–36, 104 S.Ct. 1355. Justice O'Connor explained: "By accompanying its display of a Christmas tree—a secular symbol of the Christmas holiday season—with a salute to liberty, and by adding a religious symbol from a Jewish holiday also celebrated at roughly the same time of year, I conclude that the city did not endorse Judaism or religion in general, but rather conveyed a message of pluralism and freedom of belief during the holiday season." *Id.* at 635, 104 S.Ct. 1355.

The Sixth Circuit considered both of these decisions in *Doe v. City of Clawson,* 915 F.2d 244 (6th Cir.1990), where it found no Establishment Clause violation by the display of a creche in front of city hall, in which other holiday artifacts were also shown. The court held that the challenged portion of the display must be considered in light of its "context, composition, and location." *Id.* at 247. The court found that the religious message of the creche, viewed in context with the rest of the display, was diluted by the presence of secular symbols as part of a holiday message. *Ibid.* The content of the display was important, according to the court, in order to permit a "message of pluralism" to emerge. *Ibid.* In considering the location of the display, the court observed that the creche in *Allegheny,* displayed on the

Grand Staircase of the courthouse, suggested frank government approval of its religious message, an inference significantly muted when the display is in a more traditional public forum. *Id.* at 247–48.

The Sixth Circuit addressed the issue once again in *Americans United,* in which the plaintiffs sought an injunction preventing the City of Grand Rapids from allowing a private group to display a 20–foot high steel menorah in a downtown public park. The display was paid for by private funds, save a nominal cost expended by the City to pay for electricity to illuminate the display. The display included a sign stating: "Happy Chanukah to All." 980 F.2d at 1539–40. The court found the park to be a public forum. In applying *Lemon*'s second prong, the court determined that the question of whether the display conveyed the perception of government endorsement of religion to be an objective one, in which the court assumes that the observer in question knows "all the relevant facts." *Id.* at 1543–44 (citing *Roberts v. Bailar,* 625 F.2d 125 (6th Cir.1980)). Thus,

> we do not ask whether there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person *might* think Grand Rapids endorses religion. Instead, we ask whether *the* reasonable observer *would* conclude that Grand Rapids endorses religion by allowing Chabad House's display.

*Id.* at 1544. The inquiry must pay careful attention to the context of the challenged display, and "avoid hasty reliance on partial similarities between the facts at hand and those found in other cases." *Ibid.*

The *Americans United* court agreed that several aspects of the display tended to suggest endorsement: "[t]he display sends a religious message; it stands near the heart of local government; and it does not include secular symbols." *Id.* at 1544. However, the dispositive factors were found to be the fact that the display was privately sponsored, and that it was maintained in a traditional public forum to which all residents had equal access. *Id.* at 1545. These factors were important because the reasonable observer "recognizes the distinction between speech the government *supports* and speech that it *allows.*" *Ibid.* The court observed that the placement of the menorah in a traditional public forum precluded the conclusion reached by the Supreme Court in *Allegheny,* where a creche display also sponsored by a private group, but located in a place of privilege on the courthouse's Grand Staircase, was held unconstitutional. Further, the *Americans United* court recognized that the menorah contained two small disclaimers indicating that the display was privately-sponsored and did not constitute an endorsement of religion. The disclaimers, however, were found to be "just one of the many factors to be considered," and one that merely lent strength to what was obviously a good-faith effort to preclude any perception of endorsement. *Id.* at 1546.

The court specifically rejected alternative formulations of what a hypothetical "reasonable observer" should be for endorsement test purposes. The majority was unimpressed by the plaintiffs' prospect of someone "who knows enough to infer government endorsement, but not enough to understand why there is none." *Id.* at 1550. Similarly, the majority found the dissent's definition, that of the observer who has no background knowledge of the display other than what he sees directly in front of him, was simply unreasonable. Such an approach, the Court concluded, would permit an "Ignoramus's Veto" similar to the famous "Heckler's

Veto" consistently rejected in the Supreme Court's free speech jurisprudence:

> The Ignoramus's Veto lies in the hands of those determined to see an endorsement of religion, even though a reasonable person, and any minimally informed person, knows that no endorsement is intended, or conveyed, by adherence to the traditional public forum doctrine. The plaintiffs posit a "reasonable observer" who knows nothing about the nature of the exhibit—he simply sees the religious object in a prominent public place and ignorantly assumes that the government is endorsing it. We refuse to rest important constitutional doctrines on such unrealistic legal fictions.

*Id.* at 1553. The lower court's decision was accordingly reversed, and the injunction was dissolved.

The court's decision was developed further in *Pinette v. Capitol Square Review and Advisory Board,* 844 F.Supp. 1182 (S.D.Ohio 1993), *aff'd,* 30 F.3d 675 (6th Cir.1994), *aff'd,* 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). There, the Ku Klux Klan sought permission to place a Latin cross on the Capitol Square grounds in Columbus, Ohio, together with a disclaimer about the private nature of the display. The grounds had been made available for speeches and gatherings by various groups, as well as several holiday displays. The State, however, denied the request, stating that it felt that erection of the cross would be incompatible with its obligations under the Establishment Clause. *Pinette,* 844 F.Supp. at 1183–84. The district court found that the Klan's proffered religious speech was protected and that the grounds were a public forum. The district court rejected the argument that the Establishment Clause prevented the display, relying on the holding in *Americans United* that placement of a religious object by a private organization in a

public forum precludes any reasonable observer from concluding that the public entity in question is endorsing religion. *Id.* at 1186–87.

The defendant appealed, and the Sixth Circuit affirmed. On appeal, the defendant reasserted its argument that the reasonable observer would consider the cross to be an endorsement of religion if observed from across the street. The Sixth Circuit again rejected this argument, however, stating memorably that "[t]he freedoms guaranteed by the Constitution cannot depend upon the fanciful perceptions of some hypothetical dolt." 30 F.3d at 679. On writ of certiorari, the Supreme Court affirmed the decision of the Sixth Circuit. A plurality of the Court, in an opinion by Justice Scalia, agreed that no reasonable observer could consider a private display in an open public forum to be an endorsement of religion. *Pinette,* 515 U.S. at 766, 115 S.Ct. 2440 ("Private religious speech cannot be subject to veto by those who see favoritism where there is none."); *see also id.* at 765, 115 S.Ct. 2440 ("[G]iven an open forum and private sponsorship, erroneous conclusions do not count.").

These cases make clear that under the endorsement test, it is crucial to distinguish those who are offended by a religious display on public property—regardless of whether the area can be considered a public forum—from actions by the state that can be seen as favoring or disfavoring religion. The latter exists when religion, or more precisely, religious beliefs, can be seen as relevant to standing in the political community. The plaintiffs in this case have failed to distinguish between speech which the government supports and that which it merely allows in a public forum, open equally to a range of private viewpoints.

Here, the creche, clearly a religious symbol, was displayed by a private group

amongst other secular holiday symbols and decorations. It was not given a preferred or predominant position suggesting an endorsement by the government. Considering the context, content and location of the display and its components, and viewing the evidence in the light most favorable to the plaintiffs, it cannot be said that allowing a private group to erect the nativity scene in a public forum would cause a *reasonable* observer to conclude that Tuscola County endorses religion in general or the Christian religion in particular.

Under the *Lemon* test, as shaped by the appellate decisions which bind this Court, the creche displayed on the Tuscola County Courthouse lawn by the CWICC does not violate the Establishment Clause as a matter of law.

## IV.

The plaintiffs have also filed additional discovery requests, specifically seeking physical inspection of the year-round storage location of the creche, discovery of individuals with knowledge about the "creche barn," and a request to compel answers to the plaintiffs' second set of requests for admission.

The requests concerning the creche are not well-taken in light of this Court's ruling that judgment will be entered in favor of the defendants on the plaintiffs' Establishment Clause claim. The Federal Rules of Civil Procedure permit discovery only as to matters that are "relevant to the claim or defense" of a party. Fed.R.Civ.P. 26(b)(1). Because the plaintiffs' only remaining cause of action concerns the events that transpired at the December 11, 2001 Board meeting, evidence concerning the storage and maintenance of the creche is not relevant to any remaining claim or defense. Accordingly, these requests will be denied.

The plaintiffs' second set of requests for admission deal largely with issues and claims resolved in the defendants' favor by this Opinion and Order. Furthermore, the Court's decision to deny the plaintiffs' motion for relief renders the requests inappropriate in any event. The Court will therefore deny the motion to compel.

## V.

For the reasons discussed above, the Court finds that the plaintiffs have failed to state claims for relief based on their stated theories under the Free Exercise Clause, the Due Process Clause, Sections 1985 and 1986 of Title 42 of the United States Code, the Americans with Disabilities Act, and various Michigan state and international laws, and that the plaintiffs have stated a cognizable claim under the Equal Protection Clause. The Court also finds that the plaintiffs have not shown that there are any additional documents which the defendants should have made available or evidence that documents have been concealed. Finally, the Court finds that there is no genuine issue of material fact with respect to the plaintiffs' Establishment Clause claim, and that the defendants are entitled to a judgment on that claim as a matter of law.

Accordingly, it is **ORDERED** that the plaintiffs' motion for relief from the Court's Case Management and Scheduling Order [dkt # 40] is **DENIED**. The plaintiffs' earlier Motion for an Interim Status Conference [dkt # 28] is **DENIED AS MOOT**.

It is further **ORDERED** that the defendants' motion to dismiss [dkt # 36] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that counts 1, 3, 5, 6, 7 and 8 of the amended complaint are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the defendants' motion for summary judgment [dkt # 38] is **GRANTED** and the plaintiffs' motion for summary judgment [dkt # 41] is **DENIED**. The defendants' motion to file a tardy reply brief [dkt # 64] is **DENIED AS MOOT**.

It is further **ORDERED** that the plaintiffs' Motion Requesting Physical Inspection and Photographing of the Creche Barn and Both Storage Locations [dkt # 70], Motion for Production of "Creche Barn" and Electrical Utilities Receipts and Deposition of Material "Creche Barn" Witnesses [dkt # 79], and Motion to Compel Answers to Second Set of Requests for Admission [dkt # 81] are **DENIED**.

It is further **ORDERED** that count 2 of the amended complaint is **DISMISSED WITH PREJUDICE**.