**CONGREGATION LUBAVITCH; Rabbi Sholom B. Kalmanson, Plaintiffs–Appellees,**

v.

**CITY OF CINCINNATI, Defendant–Appellant.**

**No. 92–4016.**

United States Court of Appeals, Sixth Circuit.

Argued April 27, 1993.

Decided July 8, 1993.

Norman L. Slutsky, Cincinnati, OH, Bradford M. Berry, Nathan Lewin, Niki Kuckes (argued and briefed), Miller, Cassidy, Larroca & Lewin, Washington, DC, for plaintiffs-appellees.

James F. McCarthy, III, Fay D. Dupuis (briefed), Richard Ganulin (argued and briefed), City Solicitor's Office, for the City of Cincinnati, Cincinnati, OH, for defendant-appellant.

Marc Stern (briefed), New York City, for The American Jewish Congress, amicus curiae.

Marc Stern, Lois C. Waldman, New York City, for The Jewish Community Relations Council of Cincinnati, The American Jewish Congress, amicus curiae.

Before: KEITH and SUHRHEINRICH, Circuit Judges; and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

This case involves constitutional challenges to a city's attempt to regulate by ordinance

---

the time of day during which displays and structures may be exhibited in a public forum. The district court held the ordinance provision at issue here unconstitutional as applied to the plaintiffs, a group desiring to erect and maintain a religious symbol for 24 hours a day during an eight-day period of celebration. 807 F.Supp. 1353. We affirm, although on a somewhat different basis than that enunciated by the district court.

## I.

Fountain Square, in downtown Cincinnati, is a large open plaza surrounded by commercial buildings. The Tyler Davidson Fountain, a well-known symbol of the city, is the focal point. The square is landscaped and contains trees and benches. Residents and visitors use the square in much the same way they might use a public park. This court has held that the square is a traditional public forum. *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 461 (6th Cir.1991) (*Lubavitch I* ).

### A.

For many years the city has regulated the use of Fountain Square by Chapter 713 of the Municipal Code, which also prescribes conditions for the rental of the Cincinnati Convention and Exposition Center. Prior to adoption of the amendment that precipitated the present litigation, § 713–1 of the Code provided, as relevant here:

**§ 713–1. Use of Fountain Square.**

The use of Fountain Square shall be preserved primarily for the peaceful and orderly enjoyment of the square, its facilities, appurtenances, landscaping, and the Tyler Davidson Fountain by the general public.

Any special use of Fountain Square by a person, group of persons, or organization shall not be permitted except in accordance with the terms of a permit issued by the city manager or the director of public works in strict compliance with the conditions set forth hereinafter. The city of Cincinnati need not obtain a permit for the use of Fountain Square, but must coordi-

nate the use thereof thereof the city manager.

(a) Agencies and instrumentalities of the governments of the United States, the state of Ohio, the county of Hamilton, the city of Cincinnati, and the board of education of the city of Cincinnati may use Fountain Square for legitimate public purposes subject to the right of the city manager to schedule and limit the use of the square by these governmental entities so as not to unreasonably limit the rights of the public as set forth above and to avoid conflicts in scheduling the use of Fountain Square.

Another subsection prohibited any use of the square that would present a safety hazard or obstruct access to any part of the square or the abutting buildings, sidewalks and roadways, or interfere with normal use of the square by the public.

### B.

Every year since 1987, Congregation Lubavitch by Rabbi Kalmanson (Lubavitch) has sought permission from the City of Cincinnati to erect an eighteen-foot menorah at Fountain Square for the eight-day period of Chanukah. For several years city officials denied these requests for the stated reasons that the city was opposed to the display of religious symbols on the square, that Lubavitch's proposed display was too large, or that an eight-day display was excessive. After the city denied its 1990 request for a permit, Lubavitch filed suit in district court. On December 11, 1990, the court granted a preliminary injunction requiring the city to permit Lubavitch to display a menorah during the 1990 Chanukah season. After negotiations over size, Lubavitch maintained a menorah display from December 11–19, 1990. The city sought a stay pending appeal.

Meanwhile, a new actor entered the arena. On December 11, 1990, the U.S. Knights of the Ku Klux Klan sought permission from the city to erect a ten-foot wooden cross for a period of one hour on December 22, 1990. The city approved the structural soundness of the cross and granted a permit to the KKK conditional on this court's decision to permit the menorah. The Klan cross was

erected and stood at Fountain Square for the requested period. A panel of this court denied the city's motion for a stay of the preliminary injunction on January 16, 1991. *Lubavitch I,* 923 F.2d at 462–63.

On July 29, 1991, Lubavitch filed a request with the city for a permit to display a menorah from December 1 to December 10, 1991, in Fountain Square. The city did not act immediately on this request because *Lubavitch I* was being appealed on the merits. After this court returned the case to the district court, the city took steps to amend its regulations concerning the use of Fountain Square to permit the display of religious symbols "on the same basis as other symbols and activities are permitted." With this development, at the district court's suggestion, the parties agreed to a conditional dismissal of the case. The city solicitor's office prepared draft regulations that would have permitted the menorah and the KKK cross. When the draft regulations were presented to the city council on November 13, 1991, there was considerable discussion concerning the fact that the regulations would permit displays that "could be quite controversial," might not be "well-accepted by the public," and could require security measures.

On November 14, 1991, the KKK again requested permission to erect a ten-foot cross "in the Proximity of the Menorah for 10 days." On November 20, 1991, the city council met in executive session to discuss proposed changes to the regulations. The transcript of the session was not disclosed, but following the session, the KKK was informed that it would be granted a permit on the condition that the cross be removed by 10:00 p.m. each evening and not re-erected until after 6:00 a.m. the next morning. Neither the existing nor the proposed regulations contained such a provision. The Klan refused to comply with the restriction, and the city refused to issue the permit.

On November 26, 1991, the city granted Lubavitch a permit to erect the eighteen-foot menorah display after the city's engineers specifically found that Lubavitch's eighteen-foot menorah was safe and met engineering and fire standards. Lubavitch erected the menorah on Fountain Square on December 1,

1991. This took several hours with a crew using a crane. The menorah remained on the square throughout Chanukah, with no vandalism or safety incidents.

### C.

On December 26, 1991, a new draft of the regulations, eventually approved by the city council was circulated. The new regulations barred overnight displays:

> Special use permits for Fountain Square may be issued for use between the hours of 6:00 A.M. and 10:00 P.M.... No displays, exhibits or structures erected on Fountain Square pursuant to a special use permit shall remain on the premises at times other than those stated in the permit....

This was followed by enactment of Ordinance No. 142–1992 (the ordinance), which repealed § 713–1 of the Municipal Code. The purpose of the new ordinance was stated as follows:

> Section 1. That Council hereby finds and determines that it is necessary that uses of Fountain Square pursuant to permit by non-public entities, including the presence of displays, exhibits or structures, be prohibited between the hours of 10:00 P.M. and 6 A.M. in order to maintain day-to-day control over the square; to be prepared to respond to any fire, police, traffic or medical emergency; and otherwise to protect the public peace, welfare and safety.

This ordinance and accompanying regulations, adopted in the spring of 1992, permitted persons or entities to use the square pursuant to a valid permit provided "any display, exhibit or structure" would be removed between 10:00 p.m. and 6:00 a.m. Specifically exempted from the overnight ban were "[a]gencies, *political subdivisions* and instrumentalities of the governments of the United States, the state of Ohio, the county of Hamilton, the city of Cincinnati, and the board of education of the city of Cincinnati."

There is evidence in the record that council members were concerned that this distinction between public and private exhibits, displays and structures would have the effect of banning displays that were not publicly spon-

sored, and which the city had permitted for years. For a number of years the city had granted a permit to a private organization known as the Friends of the Public Library for a period of several days in which the group held a sale of used books at the square to finance additional purchases for the public library. The books remained on the square overnight for the period of the sale. Also, since at least 1986, the city had issued annual permits to a private group known as the Downtown Council to hold an Oktoberfest celebration at the square. Tables, chairs, tents and a dance floor remained at the square overnight. And, since 1985, the city had issued a permit to the Downtown Council for a three-month holiday display on the square that included an ice-skating rink and lights and decorations relating to the holiday season. The nature of the display dictated that it could not be removed at night during the relevant period.

Following passage of the ordinance and adoption of the regulations in 1992, for the first time the Cincinnati Recreation Commission co-sponsored the four-day Oktoberfest celebration that had been privately sponsored from 1986 to 1991. In 1992, for the first time, the Recreation Commission co-sponsored the three-month holiday display previously sponsored by a private group from 1985 to 1991. The permit application for the book sale was filed a day before the regulations went into effect and was co-sponsored by the Friends of the Public Library and by Hamilton County. The permit was approved based on the sponsorship by the county and pursuant to another ordinance specifically supporting the annual event.

In 1992, when the city denied its request for a permit to erect an eighteen-foot menorah for 24 hours each day during Chanukah, Lubavitch moved the district court to set aside the conditional dismissal. The court reopened the case and set a date for a hearing. Lubavitch filed an amended complaint reciting the city's adoption of the new ordinance and regulations and seeking a permanent injunction.

Acknowledging the city's right to impose reasonable time, place and manner restrictions on the use of the square, the court found that Cincinnati's restrictions unconstitutionally discriminated against religious speech. In addition, the court held that the new requirement banning Lubavitch's overnight display had chilled Lubavitch's intended speech making "impractical if not impossible [speech] ... it cannot permissibly ban outright." Further, the court found that the council's intent in promulgating the ordinance was "to promote causes perceived to be beneficial to the community" and to discourage "unpopular views." The distinction between public and private displays could not be justified on a content-neutral basis, the court concluded. The court entered a permanent injunction against enforcement of the ordinance prohibiting private overnight displays, and the city appealed.

## II.

### A.

Briefly stated, the city argues that the district court erred in holding the ordinance invalid under the First Amendment. In maintaining that the ordinance does not regulate speech but modes of speech, the city asserts that a "mode of speech" analysis reveals three errors in the district court's decision: (1) there is no First Amendment right to modes of speech such as placing large, unattended structures in public forums; (2) the proper standard for review is not the time, place and manner test but the test delineated in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) or the rational basis test; and, (3) consequently, the motives of the council members are irrelevant. Further, the city contends the ordinance's public/private distinction is not an unconstitutional restriction related to content of speech, but rather validly distinguishes between communicative and non-communicative structures. In addition, the city argues that the court below created an unlawful preference for religious displays violating the Establishment, Free Exercise and Free Speech Clauses of the United States Constitution and correlative provisions of the Ohio constitution.

Amici curiae, the American Jewish Congress and the Jewish Community Relations

Council argue that the ordinance is a reasonable time, place and manner restriction, and that with regard to the equal protection question, the government is permitted to show favoritism toward government speech.

Lubavitch responds that the ordinance regulates speech, making the standard of review the time, place and manner test. It argues the ordinance is unconstitutional because the motives of the council members show the reasons put forth for the ordinance are pretextual and the ordinance vests limitless discretion in city officials who decide which overnight displays to permit on Fountain Square. In addition, Lubavitch asserts the ordinance violates the Equal Protection Clause of the Fourteenth Amendment in permitting some speech and prohibiting other speech based on the identity of the speaker, a distinction not "finely tailored to serve substantial state interests." *Carey v. Brown,* 447 U.S. 455, 461–62, 100 S.Ct. 2286, 2291, 65 L.Ed.2d 263 (1980).

### B.

■ The religion clauses of the First Amendment are not implicated in this appeal. It is settled law in this circuit that a city does not violate the Establishment Clause by permitting a private organization, during the observance of Chanukah, to erect a large unattended menorah in a public square that is a traditional public forum. *Americans United for Separation of Church and State v. City of Grand Rapids,* 980 F.2d 1538 (6th Cir.1992) (*en banc*). Also, at this late date it cannot be argued that the display of such an object as a menorah or a cross is not "symbolic speech" that is protected by the free speech provisions of the First Amendment. *Cf. Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989).

■ The ordinance and regulations are content-neutral on their face. They treat all structures, displays and exhibits by private individuals and organizations the same. In finding a First Amendment violation the district court looked beyond the face of the ordinance and held that its purpose was to control controversial displays and those promoting ideas not generally accepted by Cincinnatians. Thus, as applied to Lubavitch

the ordinance was not content-neutral. The district court's findings are not clearly erroneous. In fact, the evidence supports them overwhelmingly.

In presenting the draft regulations that would have opened Fountain Square to the menorah display requested by Lubavitch, the assistant city solicitor stated:

> One thing I think the Committee and Council should consider is if the City goes to an all-inclusive policy on the use of Fountain Square, the Square will be open to the display of just about any and all items, whether of favorable or unfavorable public nature, popular or unpopular causes. I think you should be aware of that, and if we go to a totally inclusive policy, groups may want to put certain things on Fountain Square which will be allowed by these amended rules and regulations that, that may not be well-accepted by the public. May require certain security measures, things like that.

This "totally inclusive policy" was discarded in favor of the new ordinance. Prior to its passage, discussion of the new ordinance with its 10–6 ban on displays and its publicly-privately sponsored distinction included the following exchange among council members.

Council member Strauss:

> I guess I just want to be sure and obviously this was, this is as a result of the problems or the concerns that we had in terms of the Ku Klux Klan and the permit situation that they had. But I want to be sure that, that the Solicitor's office is fairly confident ... that we aren't cutting off our nose to spite our face here, in terms of trying to accommodate the Friends of the Public Library on the one hand, but not wanting to make it any easier for the Ku Klux Klan to get a permit.... I guess we do this by allowing the Friends of the Public Library to be under the auspices of the Hamilton County Public Library. Is that basically what we're doing?

Council member Yates:

> I will probably vote for the ordinance but I think I agree with at least one skeptical voice that I heard on Council that, that this

ordinance may be problematic and it, it, at least has the appearance that we dressed the ordinance to favor what we would like, and maybe that's unpopular or unpleasant but it sounds to me to ring closer to what the truth is. Do you have any response to that?

Council member Mirlisena:

Well, I think that this City has many community standards that we're trying to uphold, and if in fact the language is geared toward this community, so be it. And if certain individuals are, appear to be fenced out, let them apply for a permit and see if in fact they are fenced out by this ordinance.

Later, council member Cissell testified at the district court hearing concerning the final version of the ordinance and regulations that he understood the nighttime ban to be directed at the menorah and KKK cross, as the council wanted to "[k]eep the Klan off" and "some . . . didn't want the menorah."

Although the court did not refer to the Equal Protection Clause, it did note that the distinction in the ordinance between displays of private organizations and those of public or governmental units was not justified.

### III.

#### A.

On several occasions when local or state laws have been attacked on both free speech and equal protection grounds the Supreme Court has based its decision on the Equal Protection Clause. See *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Carey v. Brown*, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980). The present case involves "the First Amendment–Equal Protection intersection," *Mosley*, 408 U.S. at 95 n. 3, 92 S.Ct. at 2289 n. 3, and we examine Lubavitch's equal protection arguments first.

The ordinance on its face makes a distinction between privately-sponsored and publicly-sponsored exhibits and displays. This requires a close look under the Supreme Court's pronouncement in *Carey:*

When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized.

447 U.S. at 461–62, 100 S.Ct. at 2290–91. In similar vein, the Court stated in *Mosley:*

[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an "equality of status in the field of ideas," and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.

Guided by these principles, we have frequently condemned such discrimination among different users of the same medium for expression. . . . Similarly, because of their potential use as instruments for selectively suppressing some points of view, this Court has condemned licensing schemes that lodge broad discretion in a public official to permit speech-related activity.

408 U.S. at 96–97, 92 S.Ct. at 2290–91 (internal footnote omitted).

In determining whether there is a sufficient nexus between the interests offered to justify an ordinance and the distinction made in the ordinance, the Court has looked to whether the regulation is underinclusive. The Court in *Mosley*, examining an ordinance that prohibited all picketing near schools except peaceful labor picketing reasoned that "under the Equal Protection Clause, Chicago may not maintain that other picketing disrupts the school unless that picketing is clearly more disruptive than the

picketing Chicago already permits." 408 U.S. at 100, 92 S.Ct. at 2292. The Court concluded the ordinance was not narrowly tailored to the city's interest in preventing non-peaceful picketing because it reached picketing that was peaceful. *Id.* In *Carey,* the Court found the statute was likewise invalid because "under the guise of preserving residential privacy, Illinois has flatly prohibited all nonlabor picketing even though it permits labor picketing that is equally likely to intrude on the tranquility of the home." 447 U.S. at 462, 100 S.Ct. at 2291. The Court held further that even if certain interests were so compelling that a content-based distinction would be valid given no adequate alternatives for achieving them, "this [was] not such a case" because "even the most legitimate goal may not be advanced in a constitutionally impermissible manner." *Id.* at 464–65, 100 S.Ct. at 2292. First, the Court held, the statute's overinclusiveness and underinclusiveness "undermine[d]" the State's claim that the prohibition was justified by the State's interest in preserving domestic tranquility. "More fundamentally," the Court stated that the content-based distinction had no relation at all to the asserted interest. *Id.* at 465, 100 S.Ct. at 2292. See also *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.,* — U.S. ——, ——, 112 S.Ct. 501, 510, 116 L.Ed.2d 476 (1991) (although the city had a compelling interest in compensating victims from the fruits of crime, there was no justification for treating differently a criminal's proceeds from his speech about the crime from his other assets).

In *Beckerman v. City of Tupelo,* the Court of Appeals for the Fifth Circuit held that a parade ordinance requiring strict formation by marchers but exempting government and school groups was unconstitutional. The court stated:

> The groups excepted from the ordinance will create traffic problems and threats to public safety caused by the physical presence of the paraders in exactly the same way that any parade would. Thus, if Tupelo were truly interested in traffic control, it would confine *all marchers* to one lane and groups of 100 or fewer. Because the City is so willing to disregard the

traffic problems in those circumstances, we cannot accept the contention that traffic control is a substantial interest.

664 F.2d 502, 513 (5th Cir. Unit A 1981).

The city argues the distinction between public and private displays is not content-based, but is a valid content-neutral distinction between communicative and noncommunicative structures. We have previously stated that the display of a menorah is "symbolic speech" protected by the First Amendment. Also, many of the "public" displays the ordinance permits are communicative. Because the ordinance is content-neutral on its face, the district court relied on statements and testimony of several city council members to conclude that in reality the ordinance is aimed at the message or content of particular symbolic speech. Having determined that the district court's findings are not clearly erroneous, we reject the idea that the distinction is not content-based.

Consequently, the ordinance violates the Equal Protection Clause unless the distinction can be shown to be finely tailored to governmental interests that are substantial. The city offered five city interests to justify the ordinance: avoiding the appearance of government endorsement of religion, controlling vandalism, containing costs, promoting aesthetics, and ensuring mobility of structures. The city has failed completely to show how these interests are served by an ordinance that requires private groups to remove all structures at 10 p.m. and not re-erect them until 6 a.m. while permitting government and quasi-government sponsored structures to remain in place on Fountain Square for 24 hours each day.

We can discern no connection between the city's desire to avoid an appearance of endorsement of religion and the distinction between privately and publicly-sponsored displays or the 10–6 ban.

The city failed to explain how vandalism is better controlled by requiring all private organizations using this public forum to remove their displays while leaving those sponsored by public bodies in place. The evidence at the hearing disclosed that there was no vandalism during the years when the menorah

was displayed for 24 hours each day during Chanukah. The same has been true of the Friends of the Library book sales and the months-long holiday displays.

Inasmuch as private organizations that use Fountain Square bear all the costs of their exhibits and displays, we cannot discern the basis for the "containment of costs" justification. The city offered no evidence that it would cost more to police privately-sponsored structures on the square overnight than it would to protect publicly-sponsored ones.

Similarly, the same aesthetic values would be implicated in permitting governmental units to place large, permanent looking structures on the square as with permitting similar privately-sponsored ones. Further, if any display offends aesthetic values, the offense would be much more pronounced during daylight hours than at night when the display would be less visible. It is difficult to see how the 10 p.m.–6 a.m. ban serves aesthetic interests.

Additionally, the city failed to explain how it ensured mobility by applying the nighttime ban only to privately-sponsored structures and displays. If the city decided that all structures on Fountain Square should be on wheels for ready evacuation in case of a fire or other emergency, the ordinance should have required it. In the case of such an emergency however, government-sponsored structures and displays would offer no less an impediment to firefighters or paramedics than those sponsored by private organizations.

Thus, we conclude that the professed interests in avoiding the appearance of endorsement of religion, controlling vandalism and containing costs do not justify the restrictions contained in the ordinance. The record contains no support for the claim that the restrictions would serve such interests. Further, the distinction between privately and publicly-sponsored displays is not narrowly drawn to serve the city's interests in aesthetics and mobility because the ordinance is underinclusive.

Finally, the city did not help itself for equal protection purposes by accepting the "co-sponsorship" of formerly private structures and displays by governmental units as a way of permitting large, immobile structures, with accompanying paraphernalia, to avoid the nighttime ban. We reject amici's argument, relying on *Rust v. Sullivan,* —— U.S. ——, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) that the distinction is nevertheless valid because the government is permitted to favor government speech over private speech. The Court in *Rust* affirmed that the government can, without violating the Constitution, selectively fund programs it believes are in the public interest and held that regulations forbidding the use of Title X funds for counselling, referral and the dissemination of information about abortion as a family planning alternative did not violate the free speech rights of fund recipients, their staffs or patients. Chief Justice Rehnquist however, writing for the Court cautioned:

> This is not to suggest that funding by the Government, even when coupled with the freedom of the fund recipients to speak outside the scope of the Government-funded project, is invariably sufficient to justify government control over the content of expression. For example, this Court has recognized that the existence of a Government "subsidy," in the form of Government-owned property, does not justify the restriction of speech in areas that have "been traditionally open to the public for expressive activity," or have been "expressly dedicated to speech activity."

*Id.,* —— U.S. at ——, 111 S.Ct. at 1776 (citations and internal citations omitted).

Combined with the evidence of the motivations behind the ordinance and the city's subsequent co-sponsorship of what were once privately-sponsored displays, the failure of the city to justify the distinction between publicly and privately-sponsored exhibits, displays and structures convinces us that the ordinance violates the Equal Protection Clause. Like the Chicago ordinance that the Supreme Court held unconstitutional in *Mosley,* Cincinnati Ordinance No. 142–1992 attempts to "grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or

more controversial views." 408 U.S. at 96, 92 S.Ct. at 2290.

As noted earlier, this case involves "the First Amendment–Equal Protection intersection." Having found an equal protection violation, we do not consider whether it independently violates free speech principles embodied in the First Amendment. *Carey,* 447 U.S. at 459 n. 2, 100 S.Ct. at 2289 n. 2.

The judgment of the district court is affirmed.