**Anonka and Tammra JOCHAM,**
**Plaintiffs,**

v.

**TUSCOLA COUNTY, Tuscola County**
**Board of Commissioners, and John**
**Does 1–5, Defendants.**

No. 01–10385–BC.

United States District Court,
E.D. Michigan,
Northern Division.

Nov. 5, 2003.

David W. Wright, Jean M. Hansen, Bloomfield Hills, MI, for plaintiffs.

Daniel S. Saylor, Garan Lucow, Detroit, MI, Joseph Kochis, Garan Lucow, Grand Blanc, MI, for defendants.

## OPINION AND ORDER DENYING DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT

LAWSON, District Judge.

The plaintiffs in this case describe themselves as non-Christian business women who own and operate a witch museum in the City of Caro, Tuscola County, Michigan. In December 2001, they filed a complaint seeking to enjoin the placement of a creche as part of a seasonal display in front of the Tuscola County courthouse; they also complained about the hostile treatment they received from county officials when the plaintiffs attempted to voice their objections to the nativity scene at a public meeting of the Tuscola County Board of Commissioners earlier that month. The complaint, which was amended in April 2002, contained eight counts based on various federal and state constitutional and statutory theories. The defendants responded with motions to dismiss and for summary judgment. The Court granted those motions as to all but one of the counts in an opinion and order filed January 7, 2003. *See Jocham v. Tuscola County*, 239 F.Supp.2d 714 (E.D.Mich. 2003). The count that remains focuses on the County Board of Commissioners meeting that took place on December 11, 2001, and alleges that the defendants denied the plaintiffs the equal protection of the law when the defendants would not permit the plaintiffs to complete a presentation during the public comment part of the meeting because of the Board's disapproval of the plaintiffs' religious viewpoint. The defendants have filed a second motion for summary judgment directed to the remaining count of the complaint. The Court heard the arguments of the parties through counsel in open court on September 25, 2003. The Court finds that there are fact issues that must be determined before the matter can be resolved, and therefore the second motion for summary judgment will be denied.

### I.

One of the plaintiffs is a woman known as Nancy Hamilton, who has identified herself in the complaint as "Anonka;" the co-plaintiff is Anonka's daughter, Tammra Jocham. They are professed atheists, and operate their witch museum within one or two blocks of the Tuscola County courthouse where the seasonal display has been erected over the past several years. They voiced their objections to the nativity scene in early December 2001 and demanded that the County order it removed from the courthouse lawn. The plaintiffs' initial concerns were expressed to the County in a letter on December 8, 2001 sent by the plaintiffs' attorney:

Madam Chairperson and Members of the Board of Commissioners:

This law office represents Caro citizens who have grave concerns regarding violations of the Establishment Clause of the First Amendment of the United States and Michigan Constitutions with respect to the nativity scene erected on the front lawn of the Tuscola County Courthouse.

As you know, you are obligated to uphold our Constitutions, else the law provides for appropriate relief, including cessation and removal of the cause of continuing violation. Anonka and Tammra Jocham seek for the Constitutions to be properly applied for all citizens. Demand is made for immediate dismantling not later than December 15, 2001, of this impermissibly placed religious display, which based upon information learned to date, was erected through action, and/or assistance of, Tuscola County and the Board of Commissioners.

Letter from Jean Marie Hansen to Chairperson and Members of Tuscola Cnty. Bd. Comm. dated December 8, 2001, Defs' Mot. for S.J. Ex. A.

A few days later, Anonka called the courthouse and voiced her continued objection to the display on government property. *See* Dep. of Nancy Hamilton at 56–57, Defs' Mot. for S.J. Ex. M. She was directed to then-Chairperson of the Board of Commissioners, Norma Bates, who invited her to express her concerns at the next Board meeting on December 11, 2001. *Id.* at 58.

It is customary for the Board to provide a period for public comment during each meeting. Under Tuscola County Board Rule 26, public comment may be subjected to certain limitations. The Rule specifically provides that "[a]ll presentations to the board during a public hearing shall be limited to a reasonable length of time. The Board of Commissioners may specifically limit the length of time for each presentation if necessary." *See* Rule 26, Defs' Mot. for S.J. Ex. E.

The plaintiffs attended the December 11, 2001 meeting, along with their attorney, Jean Marie Hansen. The meeting was not tape recorded and no verbatim record of the proceedings was made. The parties agree that the plaintiffs were called upon to state their opposition to the creche display, but what exactly occurred during the public portion of that meeting is the subject of strong disagreement among the parties. The plaintiffs contend that they unsuccessfully attempted to voice their concerns to the Board. Anonka testified at her deposition as follows:

Q. [Defs.' Attorney] Okay. And did you say anything in this meeting on December 11th?

A. I—I might have said a little bit, and that was—Again, I asked why is it not on your lawn or on the church lawn.

Q. Did you say anything else?

A. Oh, I probably did.

Q. What else did you say?

A. I said—She [Chairperson Bates] had read a religious letter that took quite a while, and then I said that— something to this effect was, well, I really don't care what you believe in, but that's all right or something to that effect, and I just don't like the religious on the courthouse lawn, something to that. The newspaper has it, did it pretty good.

.   .   .   .   .

Q. Were you the first one to speak from your group?

A. No.

Q. Who spoke first?

A. Jean Hansen did.

Q. And what did Ms. Hansen say?

A. That it's against the constitution, and that we would like it removed.

Q. Did she say anything else at that point?

A. Some—About what she said.

Q. Was there any dialogue between Ms. Hansen and the commissioners?

A. That was about the point that she [Ms. Bates] read the religious letter.... And they were commencing to say if you don't like it, don't look at it, and one [Commissioner] said, I think it was Hess, said I know what our forefathers were thinking, they wanted it to be all Christianity or something like that.

Dep. of Nancy Hamilton at 59–62, Defs' Mot. for S.J. Ex. A.

Anonka contends that her statements at the meeting generated negative and hostile reactions from some of the county commissioners. Her description of the meeting continues in her affidavit:

9. Commissioners raised their voices and a couple of them shouted. I was told that I have no rights because I was not a Christian, and "if you don't like it, don't look at it", and "we have our Believers." Another [Board Member] (Hess) said he "knew what our forefathers were thinking." I (and my daughter) was further deliberately and intentionally made fun of and ridiculed as they publicly declared that I used money and coins with god on them and so on.

10. I intended, wanted, and tried to say more, yet their hostility towards me made me sick. I was pushing myself to gain strength, stood to speak, saw County representatives to Bates' right whispering with her, and before I had the opportunity to respond the Commissioners, Bates glared directly at me and said loudly and harshly, "Your five minutes are up." I was not told earlier that I had only five minutes. I was never allowed my five minutes.

. . . . .

13. I was not given the proper treatment to fully and meaningfully speak at the December 11, 2001 Board of Commissioners meeting. Commissioners were conducting business respectfully and politely with their other Believers, but religiously discriminated against me.

14. It was abundantly clear by the ill way the Commissioners acted towards me that I was being stifled and shut down from speaking my views because of my having different religious or non-religious views. My viewpoint was suppressed and I was brought into fear by Tuscola County government officials at this public hearing.

. . . . .

18. Others followed the County's lead and joined in (with them) with further attacks, including the crosses religious persecution of us and boycott of Anonka's Musuem ... We have been subjected to religious-based threats in writing and telephone post 12/11/01 that escalated to death threats in person.

Aff. of Anonka at ¶¶ 10, 13, 14, 18, Pls.' Ans. to Mot. for S.J. Ex. 3. Plaintiff Tammra Jocham presented a similar version of events in her affidavit:

8. Bates [one of the Commissioners] had refused to acknowledge and allow me the floor. At one point I started to speak, but Commissioners abruptly cut me off. I had wanted to say more.

9. Commissioners showed that they did not want any of us to speak further even though we conducted ourselves

respectfully. They clearly communicated that they were majority Christian Believers, and my mother and I were non-Christian believers, a despicable minority who had no rights. Commissioners made hateful statements and snide comments that were not responsive to the subject matter.

Aff. Tammra Jocham at ¶¶ 8, 9, Pls.' Ans. to Mot. for S.J. Ex. 4.

The plaintiffs also filed with the Court an affidavit from a citizen who attended the meeting to observe a presentation on an issue that was unrelated to the holiday display. Scott Jacoby, a member of the Teamsters Local 214, who also attended the December 11, 2001 meeting to support another citizen speaker, his union representative, acknowledged that the plaintiffs received less favorable treatment than other presenters that evening. He also addressed the so-called "five-minute rule" to which the parties have made reference. Jacoby averred:

2. I attended the Tuscola County Board of Commissioners meeting conducted on December 11, 2001....

3. Teamsters Local 214 had complained regarding Teamsters' compensation and related matters.

4. Teamsters Local 214 representatives fully expressed union concerns without being stopped.

5. Our Teamsters' presentation was lengthy, certainly twenty minutes and could have been longer.

6. There were women who spoke at this same meeting before the Teamsters who had raised concerns regarding the nativity scene being located on the County Courthouse front law.

7. The women had spoken for a few minutes, far less than Teamsters, and the entire matter including

Commissioners' responses was totally disposed of within maybe ten minutes tops.

8. "Five minutes" was called to stop them from responding and speaking further at the meeting.

9. I don't recall any announcement earlier in the meeting of their being any "five-minute rule."

10. I don't recall any use of a "five-minute rule" at this or other meetings that I had attended.

11. Commissioners acted polite, were patient, and talked decent to the Teamsters' representatives.

12. Commissioners' attitude toward the women was different. I particularly recall that Commissioners had made "these statements" in response. For example, one stood up, pulled out a dollar bill, and staring at the women he pointed to the "In God We Trust" inscription on the money and declared: "You know what this says" and "You have no problem spending it!"

Aff. Scott Jacoby at ¶¶ 2–12, Pls.' Ans. to Mot. for S.J. Ex. 5.

The defendants describe a much different meeting through affidavits from various county officials who were in attendance. They contend that the plaintiffs were given an adequate opportunity to voice their opinions and were treated like any other citizen. William E. Wallace, Director of the Mosquito Abatement Program for Tuscola County stated:

1. I attended a meeting of the Tuscola County Board of Commissioners on December 11, 2001....

3. During a portion of the meeting, a presentation was made by three women: Nancy Hamilton, Tammra Jocham, and their attorney Jean

Hansen. Each of them had an opportunity to speak. . . .

4. The group became somewhat argumentative, in my opinion, in their demand for immediate action. I recall that one of the two women represented by the attorney became particularly aggressive in her manner of speaking ... The Board members remained polite and did not raise their voices.

5. I do not know the exact amount of time spent on the nativity scene issue, but it was approximately 8 to 10 minutes. I am certain it was more than 5 minutes. The group was given as much time and attention as any other participant in this public forum part of the meeting, and was not short-changed or cut-off; rather, they were given an ample opportunity to present their views, and in fact it certainly appeared as if they did fully present their views.

Aff. of William E. Wallace at ¶¶ 1, 3–5, Defs.' Mot. for S.J. Ex. C. Similarly, Margie White–Cormier, County Clerk for Tuscola County, averred:

1. I was present at the meeting of the Board of County Commissioners on December 11, 2001. . . .

2. A regular agenda item for Board of Commissioners' meetings is a time for public participation. The chairperson generally begins this portion of the meeting by reminding those assembled that public participation is limited to 5 minutes in order to allow those present an opportunity to address the board.

3. Nancy Hamilton and Tammra Jocham, accompanied by their attorney Jean Marie Hansen, were in attendance, and were permitted to make a presentation regarding their objections to the Christmas nativity scene, which they wanted removed from the courthouse lawn.

4. While I do not remember the exact amount of time spent on the nativity scene issue, Ms. Hansen and company were allowed significantly more than five minutes. Based on my experience of having attended numerous board meetings with numerous public participation segments, I can say that these individuals were allowed as much time, and more, with ample opportunity to make their points, as members of the public are typically given in these public participation segments.

Aff. of Margie A. White–Cormier at ¶¶ 1–4, Defs.' Mot. for S.J. Ex.D. Likewise, Michael R. Hoagland, Controller and Administrator for Tuscola County, stated:

2. I was present at the meeting of the Board of Commissioners on December 11, 2001, in my capacity as Controller/Administrator. Among those in attendance for this particular meeting were Jean Hansen, Nancy Hamilton and Tammra Jocham, who appeared together to express their objections to the holiday display on the Courthouse lawn.

3. A regular agenda item for Board of Commissioners' meetings is a time for public participation. In accordance with both long-standing practice and the Board's Rule 26 ... the chairperson routinely begins this portion of the meeting by reminding those assembled that each presentation should be limited to a reasonable amount of time, or to approximately 5 minutes of time (I do not recall specifically what was said on this particular occasion) in order to allow other participants an opportunity to speak and address the board.

4. The group Hansen, Hamilton and Jocham was given ample time to make their presentation and express their concerns about the nativity scene on the Courthouse lawn. I recall that at least three of them from their group took the opportunity to speak. Based on my experience of having attended countless Board of Commissioners meetings, this group was afforded as much or more time than normal to express their point of view. This opportunity was given even though there were others in the audience waiting to address the Board on other subject matters.

5. It is my perception that the Board was patient and courteous with these individuals. While the group was adamant in their insistence and the nativity scene be dismantled, and Ms. Hansen, in particular, was aggressive in expressing the group's strong opinions on the matter, none of the commissioners ever shouted or raised his or her voice. There were questions and answers, and throughout the presentation the commissioners were attentive and listened to the concerns expressed.

Aff. of Michael R. Hoagland at ¶¶ 2–5, Defs.' Mot. for S.J. Ex. E.

Two days later, on December 13, 2001, County Board Chairperson Bates sent a letter to the plaintiffs' attorney informing the plaintiffs that the Board had consulted its general counsel, and that it had concluded that the nativity scene offended neither the Michigan or United States Constitutions since the display was privately financed and placed in a public forum by private entities, neither encouraged nor discouraged by government officials. Bates indicated that discussion of the matter was at an end, and that she did "not believe that it would be wise or necessary to call a special meeting of the Board or to otherwise take steps to interfere with this religious expression." Ltr. dated Dec. 13, 2001 to Pls.'s Atty from Chairperson Bates, Defs.' Mot. for S.J. Ex. B.

The defendants contend in their latest motion for summary judgment that there is no factual dispute that the plaintiffs were permitted to address the County Board at its December 11, 2001 meeting on the subject of the nativity scene on the courthouse lawn. The plaintiffs allege that the defendants used an arbitrary rule to cut them off based on the content of their speech, and treated them differently from others who made presentations on other subjects.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). A motion for summary judgment under Fed.R.Civ.P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no genuine issue of material fact. *Simmons–Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir.2000), *rev'd on other grounds*, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir.2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir.2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir.1994) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir.2000).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir.2002). The party opposing the motion may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If the nonmoving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir.2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir.1991).

The defendants in this case contend that the undisputed facts establish that the plaintiffs were permitted to address the County Board and express their views on the impropriety of allowing the nativity scene to be placed on public property. The only issue in this case, the defendants insist, is whether the county officials could limit the length of time of the plaintiffs' presentation. They say that the Board's rule limiting the duration of public comment to a "reasonable length of time" is a contend-neutral rule that could be enforced against the plaintiffs. They point to cases finding the limitation on public comment at official legislative meetings to be reasonable, such as *Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 271 (9th Cir.1995) (finding three-minute limitation reasonable), and *Wright v. Anthony*, 733 F.2d 575, 577 (8th Cir.1984) (finding five-minute limitation reasonable).

This Court previously determined that the county board meeting at issue in this case, where the Board, although not obliged to do so, opened a portion of the meeting for citizens' comments, was "the quintessential limited public forum" at which the Board "retain[ed] substantial control over the manner in which citizen comments are presented." *Jocham*, 239 F.Supp.2d at 728. Referring to *Gault v. City of Battle Creek*, 73 F.Supp.2d 811, 814 (W.D.Mich.1999) (in which the court granted the plaintiffs' motion for a preliminary injunction against further interference with their right to speak at council meetings about a police chief's alleged misconduct), the Court noted that "[c]itizen commentary can be suppressed if it becomes irrelevant or repetitious, or disrupts, dis-

turbs or otherwise impedes the orderly conduct of the Council meeting, so long as the speaker is not stopped from speaking because the moderator disagrees with the viewpoint he is expressing." *Jocham*, 239 F.Supp.2d at 728 (internal quotes omitted).

■ Although the right of a citizen to address his or her elected representatives to express views on a matter of public concern is fundamental, *see Gable v. Lewis*, 201 F.3d 769, 771 (6th Cir.2000), it is equally well established that the county government can place reasonable limits on the time, place, and manner of public expression, as long as they "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (citing *United States Postal Service v. Council of Greenburgh*, 453 U.S. 114, 132, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981)). The plaintiffs here do not dispute the County's right to impose these limitations, but rather contend here that (1) the rule must be uniformly applied, and (2) the rule was not applied equally to them because of the content of what they were saying at the meeting.

■ As to the first point, it is clearly established that the Equal Protection Clause forbids the application of rules governing public fora in such a way as to abridge the right to speak out on the basis of the content of speech. *See Carey v. Brown*, 447 U.S. 455, 461–62, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (stating that "[w]hen government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized"). This principle is founded on the

First Amendment, which "above all else ... means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). A regulation applied to limit the duration of a citizen's presentation based on how long the public official is willing to tolerate the speaker's message violates the Constitution, because "[a]ny restriction on expressive activity because of its content would completely undercut the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Id.* at 96, 92 S.Ct. 2286 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). The Supreme Court eloquently explained the relationship of equal protection and First Amendment rights in the application of laws regulating access to public fora:

> Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an "equality of status in the field of ideas," and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.

*Mosley*, 408 U.S. at 96, 92 S.Ct. 2286 (footnote omitted). *See also Congregation Lu-*

*bavitch v. City of Cincinnati,* 997 F.2d 1160, 1165 (6th Cir.1993) (holding that "[w]hen government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized.")

■ The defendants in this case have submitted affidavits from county officials stating that the plaintiffs were given adequate time to make their presentation, that they were treated with respect, and that, like every other citizen, they were subject to the "long-standing practice ... reminding those assembled that each presentation would be limited to a reasonable amount of time, or to approximately 5 minutes of time." *See* Aff. of Norma Bates at ¶ 6, Defs' Mot. for S.J. Ex. F; Aff. of Gerald Peterson at ¶ 6, Defs' Mot. for S.J. Ex. G; Aff. of Ed Scollon at ¶ 6, Defs' Mot. for S.J. Ex. I; Aff. of Ken Hess at ¶ 6, Defs' Mot. for S.J. Ex. J; Aff. of Don McLane at ¶ 6, Defs' Mot. for S.J. Ex. K. The defendants acknowledge, however, that individual members of the Board did not hide their feelings regarding the propriety of the plaintiffs' request to remove the creche. The plaintiffs have submitted evidence that they were not permitted to complete their presentation; that they were cut off by Board members who made numerous references to God, and who argued that the plaintiffs' non-Christian views made little sense since the plaintiffs pledge allegiance to the flag under God and spent money referencing God; and that other citizens who spoke on different matters were not subjected to any similar time limitations or diatribes. *See* Aff. of Anonka at ¶¶ 10, 13, 14, 18, Pls.' Ans. to Mot. for S.J. Ex. 3; Aff. Tammra Jocham at ¶¶ 8, 9, Pls.' Ans. to Mot. for S.J. Ex. 4; Aff. Scott Jacoby at ¶¶ 2–12, Pls.' Ans. to Mot. for S.J. Ex. 5.

The Court agrees with the defendants' observation that the plaintiffs have no constitutional right to have the County Board accept their controversial viewpoint. However, the Tuscola County Board of Commissioners is a civil legislative body, not a council of elders or a synod. The plaintiffs have presented evidence from which a reasonable fact finder could infer that Board members were intolerant of the plaintiffs' atheism, and used the Board's Rule 26 to stifle the plaintiffs' expression of their view that the nativity scene should be removed from public property because that view offended the Board members' Christian beliefs. Federal courts acknowledge the propriety of such claims where it is established that "(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or *religion,* to punish or inhibit the exercise of a constitutional rights, or by a malicious or bad faith intent to injure the person." *Zahra v. Town of Southold,* 48 F.3d 674, 683 (2d Cir.1995) (emphasis added). *See also, Esmail v. Macrane,* 53 F.3d 176, 180 (7th Cir.1995) (stating "[b]ut neither in term nor in interpretation is the [Equal Protection] [C]lause limited to protecting members of an identifiable group. It has long been understood to provide a kind of last-ditch protection against governmental action wholly impossible to relate to a legitimate government objective"); and *Wright v. MetroHealth Med. Ctr.,* 58 F.3d 1130, 1137 n. 7 (6th Cir.1995) (noting that to prevail on a claim for selective enforcement of a facially valid regulation, there must be proof that the action was "motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by [a] malicious or bad faith intent to

injure the person"). The Court is obligated to view this evidence in the light most favorable to the plaintiffs when adjudicating a motion for summary judgment. Having done so, the Court finds that the plaintiffs have shown that the facts are sufficiently in dispute as to require a trial for resolution of their remaining claim based on a violation of the Equal Protection Clause.

### III.

For these reasons discussed above, the Court finds that the plaintiffs have stated a cognizable claim under the Equal Protection Clause for which a genuine factual dispute exists. The matter must proceed to trial.

Accordingly, it is **ORDERED** that the defendants' second motion for summary judgment [dkt # 109] is **DENIED.**

It is further **ORDERED** that the Case Management and Scheduling Order is **MODIFIED** as follows: the parties proposed Joint Final Pretrial Order is due **January 30, 2004;** the Final Pretrial Conference is scheduled for **February 10, 2004;** trial shall commence on **February 24, 2004** at 8:30 a.m.